[Crim. No. 4728. In Bank. Sept. 20, 1946.]

THE PEOPLE, Respondent, v. JOHN THOMAS
HONEYCUTT, Appellant.

Frederic H. Vercoe, Public Defender, and William B. Neeley, Deputy Public Defender, for Appellant.

Robert W. Kenny, Attorney General, and Frank Richards, Deputy Attorney General, for Respondent.

SCHAUER, J.—Defendant was charged with the murder of Florence Honeycutt, his wife, and with two prior convictions of felony. He pleaded not guilty and not guilty by reason of insanity and admitted the prior convictions. A jury found that he was guilty, made no recommendation as to penalty, and found that he was sane at the time the offense was committed. This is an automatic appeal from the judgment imposing the death penalty. (Pen. Code § 1239, subd. (b).) Defendant contends, and his contention is correct, that the instructions as to what constitutes murder of the first (as opposed to murder of the second) degree were erroneous in two particulars: First, in that the jury were told that ''certain kinds of murder [by enumerated means and on enumerated occasions] . . . carry with them conclusive evidence of premeditation . . .''; and, second, in that the jury were told that ''A man . . . can premeditate, that is, think before doing the act, the moment he conceives the purpose. . . .'' The People contend that, in the circumstances of this case, such errors could not have prejudiced defendant. For the reasons hereinafter stated we agree with this contention of the People and have concluded that the judgment must be affirmed.

The evidence is without substantial conflict except on the crucial question (as to the degree of the crime) of whether, as defendant repeatedly stated after the homicide, ''he had made up his mind to kill her,'' or whether, as he testified at the trial, he had never planned or premeditated the killing of his wife.

Defendant first met Florence, the deceased, in August, 1944, in San Francisco. They intermarried in San Francisco and lived together there. Florence's mother and stepfather lived near Roscoe in the county of Los Angeles. In August, 1945, her stepfather went to San Francisco and ''brought her down from that city.'' Florence then lived with her mother and stepfather and worked as a waitress in a cafe owned and operated by the stepfather. Approximately three weeks after Florence left San Francisco defendant came to Roscoe and visited Florence at the restaurant. In early September, 1945, defendant and Florence spent 11 days in Highland Park as guests of Mrs. Greenhaw, a friend of Florence. During this time both defendant and Florence were under the influence of intoxicating liquor ''[m]ost of the time.'' When they left the home of Mrs. Greenhaw defendant and Florence moved to a rented room. They lived there one week. The landlord then requested them to move because of their excessive drinking.

Florence returned to the home of her mother and stepfather and defendant moved to another rented room.

Late in September defendant again went to the stepfather's restaurant to see Florence. He was under the influence of intoxicating liquor and "hung around" for more than an hour although Florence's stepfather requested him to leave. The stepfather called the police. Defendant was arrested, charged with drunkenness, pleaded guilty, and spent about three days in jail.

Defendant next saw Florence on November 12, 1945. On that day he started drinking at 9:30 a.m. He went to her family's residence shortly before 6 p.m., knocked at the door, and Florence's mother told him that Florence was not there. However, Florence came out of the house onto the back porch, and she and defendant talked "in a low, normal tone of voice" for a few minutes. She gave defendant six or seven dollars and defendant left. As soon as defendant went away Florence's stepfather barricaded the front door by wedging a chair under the door knob. Defendant went to a bar, drank "10 or 15 beers," purchased a bottle of muscatel wine and drank most of it. Shortly after 7 p.m. defendant returned to the home. He knocked at the back door; the stepfather refused to admit him. He went to the kitchen window; the stepfather told him to "get away from here." Defendant replied, "I am coming in. . . . You big fat-bellied son of a bitch, if you don't come outside . . . I am coming in. . . . I will kill you." Defendant went to the front porch, onto which a living room window opened. He threw a gallon jar which contained ferns through the window. Florence's stepfather armed himself with a 3-inch square "meat tenderizer" and stationed himself inside this window. The jar hit him in the stomach. Defendant knocked glass remnants from the sash of the shattered window with a flower pot and came through the window. Florence's stepfather struck defendant with the "meat tenderizer" and it became tangled in the curtain. Defendant tore down the window shade. He kicked the stepfather (who was 62 years of age and crippled) in the stomach, knocking him to the floor. The stepfather fell against Florence's mother, knocking her to the floor. The stepfather "grabbed him [defendant] by one foot, and he kept kicking me in the stomach with the other one. . . . I couldn't hold him any longer, because he kept kicking me, and knocked the wind out of me." Defendant went through the living room

and bathroom into a bedroom where Florence was. The step-father left the house, drove to a telephone, and called the police. Florence's mother got up, went into the bedroom, and saw defendant and Florence standing near one another. They were talking but the mother could not hear what they said. Defendant had in his hand a wine bottle which was about one quarter full. Florence's mother ordered defendant to leave. Defendant "said he was there to get Florence and he was going to get her." Florence said, "Johnny, what did you do such a terrible thing for?" Her mother did not hear defendant's reply. Florence and defendant walked into an adjoining room. Defendant grasped Florence's wrist and she said, "Don't, Johnny, you are hurting me." They walked toward the door which led to the kitchen. Florence then "stood still. And then he hit her on the head with this wine bottle." Florence "kind of teetered around" and defendant knocked her to the floor. She lay there, quiet. Defendant choked her, then jumped with both feet seven or eight times on her head and body. Her mother "tried to scratch his face and pull his hair, and he said . . . , 'Get out of my road, or I will kill you and throw your body on top of hers.' . . . Then from there he went to the kitchen. . . . He was looking through the drawers, and I asked him what he was looking for, and he said, 'Never mind.' . . . I was so scared that I ran out of the place."

Defendant took a meat grinder from a kitchen drawer and beat Florence (or her body) severely about the head and face until the handle of the meat grinder broke. Three of her teeth were knocked out. Defendant then obtained a butcher knife from a kitchen drawer, cut her throat five times, ripped open her clothes, twice cut her from the pubic symphysis to the lower border of the breasts, pulled out her intestines, and cut each of her thighs.

The police arrived at the residence at about 7:25 p.m. As they approached the house they saw, through the glass of the door, defendant rising from the place where, they later determined, Florence's body lay. As they opened the door defendant was walking into the kitchen, carrying the meat grinder. He started to wash it at the sink and they arrested him. The butcher knife, bent and bloody, was partly concealed under a pile of clothing which lay on the floor near the body. The neck and other pieces of a broken bottle which bore the label, "Muscatel," were on the floor. (There is a conflict in the evidence as to whether this bottle had been carried into the

house by defendant.) Defendant did not appear to be intoxicated although it was apparent that he had been drinking. On his head was a superficial cut about one half inch long.

Both on the night of November 12 and on November 13 defendant voluntarily stated to police officers that the killing was premeditated and expressed the hope that he would receive the death penalty. He said that he repeatedly attacked deceased in the various manners above stated because ''she was still breathing and moaning . . . she still seemed to be alive. . . . She wouldn't die.'' After his arrest he asked ''ten or twelve times on the way to the Station—if we were sure that she was dead. . . . And when we assured him that she was dead, he said, 'Well, I did a good job, didn't I?' '' When he arrived at the police station defendant, without being requested to do so, said he would like to make a statement. He further said that ''he would like to have the representatives of the Press there to get his story.'' He had previously twice described the killing in detail but had refused to state any reason for his actions. That, he had several times said, was ''a secret that I will take to my grave.'' However, at the station he not only again described the killing in detail but also, in a statement which was reduced to writing, thereafter read by the defendant and signed by him, he said, that ''one of the reasons he had done so and had premeditated doing so for quite a long time past, was the fact that his wife had been intimate with . . . her step-father.'' In the signed statement it further appears that defendant was asked, ''Did this killing tonight result in any way from . . . [the step-father's] causing your arrest for drunkenness?'' and answered, ''It was the arrest and by him being intimate with her. It was both. I even told him that the next time I was arrested I would be arrested for a good charge. I kept my word. Too bad I didn't kill him too. . . . Last week I thought it over but tonight it came to the climax.'' Such statement also shows the following questions and answers: ''Q. You had planned to kill your wife before you got drunk? A. Definitely. Q. When did you start drinking today? A. This morning at 9:30. Q. You had planned to kill before you started drinking this morning? A. Yes, absolutely, when I was sober. Q. Is there anything more that you want to add to this statement? A. I don't know. I don't see anything that would help me, because I'm going. I know that. Q. Mr. Honeycutt, this statement has been made freely and voluntarily without any promise of reward or

immunity or any threat or force or violence used on you?
A. Yes, I asked to make the statement, didn't I? Q. If after
reading this statement you find it to be true, are you willing
to sign it? A. Yes, if everything is there that I brought up,
yes. Why shouldn't I? I'm gone anyway.''

Defendant in his testimony did not deny the substance of
the above recited matters, but testified that he did not recall
his reason for returning to the home of Florence's family on
the evening of November 12, that he did not recall speaking
with Florence's stepfather through the kitchen window, that
he remembered breaking the front window with the jar and
flower pot and starting to go through the window and ''it
felt to me that I was hit on the head with something, and the
next thing I remember is that I saw my wife laying there,
and she had been cut.'' He said, in response to specific ques-
tions, that he did not remember striking Florence or ''doing
anything to her.'' Upon having his attention called to the
statement which he had signed, in which he related in detail
his hitting her with the sausage grinder, with his fists, stamping
her with his feet ''in the ribs, in the face, and in the stomach,''
and being asked if he remembered ''making that statement to
the officers at that time,'' he gave the following explanation:
''I remember very well making a statement to that effect,
but the reason I made that is for the simple reason I saw the
meat grinder and the butcher knife and so forth, and evidently
any person that would look at it could tell how the body had
been mistreated by seeing those weapons laying there, that it
had been mistreated by a knife and a sausage grinder.'' He
also explained that he had come to the conclusion that he had
jumped on the body because ''my feet were sore and then I
had blood on my shoes, and lower portions of my trouser legs.''
As to his statement to the police that the killing was ''planned
and premeditated, move by move,'' he explained that he said
that because ''after realizing what I had done, I wanted to
die. . . . As far as planning it, I never had.'' He testified, on
cross-examination, that he had never accused Florence's step-
father of being intimate with her and that he (the defendant)
had not felt any ill will toward him on any account.

The jury were instructed in the language of the Penal
Code (§§ 187-189) that:

''Murder is the unlawful killing of a human being, with
malice aforethought.

''Such malice may be express or implied. It is express when

there is manifested a deliberate intention unlawfully to take away the life of a fellow-creature. It is implied, when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

"All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of willful, deliberate, and *premeditated killing,* or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, or mayhem, is murder of the first degree; and all other kinds of murder are of the second degree."

Defendant complains of two instructions given in connection with an explanation of these statutory definitions. The first is the illogical and disapproved former stock instruction that "certain kinds of murder . . . carry with them conclusive evidence of premeditation. . . . Where the killing is done in the perpetration, or attempt to perpetrate, some one of the felonies enumerated in the statute [Pen. Code, § 189], here the occasion is made conclusive evidence of premeditation. . . ." As pointed out in *People* v. *Valentine* (1946), 28 Cal.2d 121, 134-137 [169 P.2d 1], and in *People* v. *Bernard* (1946), 28 Cal.2d 207, 211 [169 P.2d 636] (where the instruction is quoted at length), "the fact that a killing is committed in the perpetration of, or attempt to perpetrate, one of the five felonies enumerated in section 189 of the Penal Code is not conclusive, or necessarily any, evidence that such killing was deliberate and premeditated. Even where the killing [murder] in perpetration or attempted perpetration of one of the named felonies is unintended and accidental, nevertheless, as held in *People* v. *Lindley* (1945), 26 Cal.2d 780, 791 [161 P.2d 227], 'the offender "is guilty of murder of the first degree by the force of the statute." . . .' . . . Killings [murders] by the means . . . under discussion are murders of the first degree because of the substantive statutory definition of the crime. Attempts to explain the statute to the jury in terms of nonexistent 'conclusive presumptions' tend more to confuse than to enlighten a jury unfamiliar with the inaccurate practice of stating rules of substantive law in terms of rules of evidence." Defendant, however, does not point out, and there does not appear to us, any respect in which the giving of the erroneous instruction was prejudicial in this case.

Defendant further complains of the giving of the repeatedly criticized stock instruction that "There need be . . .

no appreciable space of time between the intention to kill and the act of killing. It is necessary only that the act of killing be preceded by and the result of a concurrence of will, deliberation and premeditation on the part of the slayer, and if such is the case, the killing is murder in the first degree, no matter how rapidly these acts of the mind may succeed each other, or how quickly they may be followed by the act of killing. A man may do a thing . . . deliberately . . . from a moment's reflection as well as after pondering over the subject for a month or year. He can premeditate, that is, think before doing the act, the moment he conceives the purpose, as well as if the act were the result of long preconcert or preparation.'' The first two sentences of the quoted instruction are abstractly correct (but likely to be misleading) statements of law. The last two quoted sentences are clearly erroneous. It is misleading to encourage a jury to find that an act is truly deliberate though it come instantaneously from but ''a moment's reflection as well as after pondering over the subject for a month or year.'' And it shames the law as it violates the truth to say that a man can premeditate the moment he conceives the purpose. ('' [P]remeditate,'' according to Webster's New International Dictionary (2d ed.) means to ''think on, and revolve in the mind, beforehand; . . . contrive and design previously.'') As this court said in *People* v. *Bender* (1945), 27 Cal.2d 164, 182-185 [163 P.2d 8], ''if an act is deliberate and premeditated even though it be executed in the very moment it is conceived, with absolutely 'no appreciable' time for consideration—then it is difficult to see wherein there is any field for the classification of second degree murder''; even the abstractly correct portion of the instruction (p. 185 of 27 Cal.2d) ''emphasizes the rapidity with which thoughts may follow each other, [and in such a case] fairness requires a further instruction placing at least equal emphasis on the true . . . meaning of the terms. In other words, while the jury may be told that the brain can function rapidly they must not be misled into thinking that an act can at the same time be hasty, hurried, and deliberate, or impulsive, unstudied, and premeditated. The extent of the reflection in every case, if it is to pass the test, must fairly and reasonably meet the ordinary and unquestioned significations of the test words.'' (See, also, *People* v. *Valentine* (1946), *supra,* 28 Cal.2d 121, 134.)

In this case other, correct instructions, conflicting with

the above quoted erroneous instruction, were given. Thus, after erroneously telling the jury that "A man may do a thing wilfully, deliberately and intentionally from a moment's reflection as well as after pondering over the subject for a month or year" and that "he can premeditate . . . the moment he conceives the purpose," the court correctly declared the very antitheses of those propositions. It advised the jury that "the adjective 'deliberate' and the verb 'premeditate' are used in these instructions in their common, well-known, dictionary meanings"; specifically, that "deliberate means formed, arrived at, or determined upon as a result of careful thought and weighing of considerations: as a deliberate judgment or plan; carried on *cooly* and steadily, according to a pre-conceived design; weighing facts and arguments with a view to a choice or decision; careful in considering the consequences of a step; unhurried, characterized by reflection; dispassionate, not rash. Deliberation means careful consideration and examination of the reasons for and against a choice or measure. The verb 'premeditate' means to think on and revolve in the mind beforehand; to contrive and design previously." ▮ Furthermore, the jury were properly admonished (see *People* v. *Holt* (1944), 25 Cal.2d 59, 90-91 [153 P.2d 21] ; *People* v. *Thomas* (1945), 25 Cal.2d 880, 902 [156 P.2d 7] ; and *People* v. *Valentine* (1946), *supra,* 28 Cal.2d 121, 132) that "even though you are satisfied beyond a reasonable doubt that the defendant committed the homicide as alleged in the information and are further satisfied that he did so with the specific intent to kill, . . . the mere proof of such specific intent is not sufficient to establish the homicide as murder of the first degree. You must further be satisfied beyond a reasonable doubt that such intent to kill was formed after the defendant had deliberated and premeditated on his course of action. The verb 'deliberate' means 'to weigh in the mind; to consider the reasons for and against; to consider maturely; to weigh the arguments for and against a proposed course of action. Deliberation means careful consideration and examination of the reasons for and against a choice or measure.' The verb 'premeditate' means 'to think over, and revolve in the mind, beforehand; to contrive and design previously.' Both deliberation and premeditation must precede the forming of the intent to kill to constitute first degree murder."

▮ It is true that "In a case where there is a conflict in the instructions and the court erred in the giving of one or

more of them, and where it is impossible to determine whether the jury followed the law as correctly or as incorrectly set before them, a new trial will be ordered if by such error the defendant's substantial rights were affected.'' (8 Cal.Jur. § 608, p. 633; *People* v. *Dail* (1943), 22 Cal.2d 642, 653 [140 P.2d 828].) This principle of law will be vigilantly enforced.

■ But here, considering all the instructions together, and in the light of the evidence, we cannot say that in this case the jury were misled by the erroneous instructions of which defendant complains. Upon any rational view of the evidence and instructions the verdict cannot reasonably be deemed to have been·the result of a misconception of the law. Under such circumstances a reversal of the judgment is not required. (Cal. Const., art. VI, § 4½.)

■ Defendant urges that ''The very manner and means by which the homicide was committed in themselves negative the elements of 'premeditation and deliberation' as they have been defined in their applicability to first degree murder. These factors together with the defendant's intoxication establish the homicide as one of murder of the second degree,'' and that this court should exercise its power to reduce the degree of the crime. We agree with the People that the series of violent, criminal acts of defendant, once he had actually started to make his kill, does not establish that, despite the evidence to the contrary, the determination that he would kill could not have been deliberate and premeditated. The jury impliedly found that such acts indicated, rather, a continuity and singleness of purpose. And the question as to the effect of defendant's intoxication, if any, was for the jury and they, adequately instructed on the subject, impliedly found against defendant's contention. It may be noted, in this connection, that the evidence is ample to support a finding that, in the hour before the killing, the defendant deliberately resorted to the use of intoxicants with the object of dulling any compunctions he thought might otherwise hamper him in carrying out the plan he had formed.

Defendant does not contend, and it does not appear, that there was prejudicial error in the trial of the issue of his legal sanity.

For the reasons above stated the judgment is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., and Spence, J., concurred. Edmonds, J., concurred in the judgment.