[Crim. No. 4756.   Third Dist.   Dec. 9, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. WILLIAM JUNIOR CONLEY, Defendant and Appellant.

50

Robert Y. Bell for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edsel W. Haws, Edward A. Hinz, Jr., and Charles P. Just, Deputy Attorneys General, for Plaintiff and Respondent.

FRIEDMAN, J.—In October 1964 a jury in Mendocino County found defendant Conley guilty of the first degree murder of Elaine McCool and her husband, Clifton McCool. Defendant was sentenced to life imprisonment. In March 1966

the judgment of conviction was reversed by the State Supreme Court. (*People* v. *Conley*, 64 Cal.2d 310 [49 Cal.Rptr. 815, 411 P.2d 911].) A second trial in Mendocino County culminated in a deadlocked jury. On defendant's motion venue was changed to Tehama County and he was tried a third time in January and February 1967. The jury found him guilty of the first degree murder of both victims, and concurrent life sentences were imposed. He appeals.

The statement of facts in *People* v. *Conley*, *supra*, 64 Cal.2d at pages 314 and 315, summarizes the evidence in detail. Suffice it to say here: Defendant was involved in an affair with Mrs. McCool, who wished to terminate it and return to her husband. After she told him she was ending the relationship, defendant indulged in several days of heavy drinking, then traded his automobile for a rifle, bought ammunition and shot both husband and wife. His blood alcohol level at the time of the shooting was high enough to indicate a possibility of impaired judgment. Psychiatric evidence pointed to a somewhat disordered personality but was characterized by conflicting claims regarding his capacity to entertain malice and to premeditate. Although he claimed to remember nothing of the shooting, several psychiatrists testified that he had been conscious of his actions. The jury found him guilty of two premeditated murders, then rejected his insanity plea.

## Jury Instructions

Conley's first conviction was reversed by the Supreme Court for absence of a jury instruction on "nonstatutory" voluntary manslaughter. Footnote 4 of the *Conley* opinion (64 Cal.2d at pp. 324-326) consists of a suggested comprehensive jury instruction, defining the various kinds of murder and manslaughter as affected by evidence of diminished capacity and unconsciousness attributable to mental defect or voluntary intoxication. A portion of that instruction describes two kinds of voluntary manslaughter recognized by California law: first, the "heat of passion" or "sudden quarrel" variety expressed in Penal Code section 192, subdivision 1; second, the nonstatutory variety, where "due to diminished capacity caused by mental illness, mental defect, or intoxication, the defendant did not attain the mental state constituting malice."

On Conley's first appeal, on substantially identical evidence as here, the Supreme Court held that absence of the instruction on nonstatutory voluntary manslaughter required

reversal. A careful examination of the record of the last trial indicates omission of this very instruction. The same result—reversal—must follow here.

The Attorney General urges that the trial judge gave the equivalent of this instruction by telling the jurors that they could not find defendant guilty of first or second degree murder if, by reason of diminished mental capacity, he did not harbor malice aforethought. Repeating the argument under another heading of the law, he urges the error's harmlessness. As in *People* v. *Aubrey*, 253 Cal.App.2d 912, 919 [61 Cal. Rptr. 772], this combination of instructions gave the jury an opportunity to acquit defendant if they found no malice, but none to find him guilty of nonstatutory voluntary manslaughter. Whatever deductions legal reasoning might draw from the combination of instructions, the pivotal fact is that only one kind of voluntary manslaughter was defined for the jury, that described in Penal Code section 192, subdivision 1. The jury were not informed that diminished capacity due to voluntary intoxication might reduce the killing to voluntary manslaughter. As a matter of law, the error requires reversal. ■ "The denial of the right to have a significant issue determined by the jury is in itself a miscarriage of justice within the meaning of article VI [section 13] of the Constitution and requires reversal." (*People* v. *Conley, supra,* 64 Cal.2d at pp. 319-320; see also *People* v. *Modesto,* 59 Cal.2d 722, 730 [31 Cal.Rptr. 225, 382 P.2d 33].)

We turn to other claims of error which might arise on retrial.

Defendant charges error in the instructions on intoxication. In substance, the trial court gave both CALJIC 78 (Rev.) and CALJIC 319 (Rev.), both of which convey the idea expressed in the first sentence of Penal Code section 22: "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition." The Supreme Court has criticized such instructions where the crime charged (such as murder) involves specific intent. (*People* v. *Ford,* 60 Cal.2d 772, 796 [36 Cal.Rptr. 620, 388 P.2d 892]; *People* v. *Spencer,* 60 Cal.2d 64, 87 [31 Cal. Rptr. 782, 383 P.2d 134].) In Conley's trial the juxtaposition of these two instructions with those on diminished capacity could not but leave the jurors in a state of hopeless confusion. As pointed out in *Spencer,* 60 Cal.2d at page 87, jurors should not be called upon to perform the intricate analysis necessary to reconcile these instructions.

When there is an issue of diminished capacity due to intoxication, an instruction in the language of Penal Code section 22 is not necessarily error. (*People* v. *Sievers*, 255 Cal.App.2d 34, 37 [62 Cal.Rptr. 841].) There is no need for such an instruction superimposed upon the *Conley* instruction framed by the Supreme Court. The basic notion of section 22—that intoxication does not exculpate but may affect specific intent—is suffused throughout the *Conley* instruction. A homicide case featured by a defense of diminished capacity attributable to a mixture of intoxication and mental disorder inevitably involves the jury in complex and subtly differentiated notions. If a trial judge can convey these notions to lay jurors in more simple terms than those articulated in footnote 4 of the *Conley* opinion, he is welcome to the attempt. If he cannot, he should give the *Conley* instruction with no more emendation than the evidence demands.

The last paragraph of the *Conley* instruction, dealing with a type of involuntary manslaughter, will confront the judge retrying this case with a special problem.[1] That paragraph presupposes evidence of unconsciousness due to voluntary intoxication but not mental disorder or defect. (*People* v. *Chapman*, 261 Cal.App.2d 149, 173-174 [67 Cal.Rptr. 601] (hg. den.).) It describes a partial defense to the homicide charge. Unconsciousness due to mental disorder is a complete, not a partial, defense. (*People* v. *Wilson*, 66 Cal.2d 749, 761 [59 Cal.Rptr. 156, 427 P.2d 820] ; *People* v. *Baker*, 42 Cal.2d 550, 575 [268 P.2d 705].) Where there is evidence of unconsciousness involving both voluntary intoxication and mental disorder, instructions on both theories are appropriate. (*People* v. *Baker, supra*, 42 Cal.2d at pp. 573-575 ) On retrial there may or may not be a claim of unconsciousness. That claim may or may not be premised on evidence of mental disorder as well as voluntary intoxication.

At this point the trial judge's problems become quite esoteric. He will face the task of fitting psychiatric testimony into instructions on several kinds of unconsciousness classified

---

[1]The last paragraph of the Supreme Court's *Conley* instruction appears in the footnote on page 326 of 64 Cal.2d and reads: ''Thus, if you find that the defendant killed while unconscious as a result of voluntary intoxication and was therefore unable to formulate a specific intent to kill or to harbor malice, his killing is involuntary manslaughter. The law does not permit him to use his own vice as a shelter against the normal legal consequences of his act. An ordinary and prudent man would not, while in possession of a dangerous weapon, permit himself to reach such a state of intoxication as to be unconscious of his actions.''

54

by legal effect. ■ He must bear in mind that "an instruction that does not distinguish unconsciousness caused by voluntary intoxication from that induced by other causes is erroneous." (*People* v. *Conley, supra,* 64 Cal.2d at p. 324.) In addition to the *sua sponte* instruction on nonstatutory voluntary manslaughter, he encounters the alternatives of giving or withholding the involuntary manslaughter instruction embodied in the last paragraph of the *Conley* footnote, as well as the instruction on unconsciousness due to mental disorder. These latter alternatives involve both the judge's obligations and tactical choices for the defense. If the jury is about to be offered two kinds of voluntary manslaughter, the defendant may wish to eschew the additional option of involuntary manslaughter described in the last paragraph of the *Conley* instruction, preferring to rely on the theory of unconsciousness due to mental disorder.[2] On the other hand, by *sua sponte* omission of the last paragraph of the *Conley* instruction, the trial judge opens the record to attack on appeal. As this court pointed out in *People* v. *Chapman, supra,* 261 Cal.App.2d at pages 173-174, the circumstances of the trial may call for a defense request for the last paragraph of the *Conley* instruction and not force it upon the trial judge *sua sponte.* To the extent that the Supreme Court has not imposed *sua sponte* obligations, the judge retrying this case might well involve counsel in some of these alternatives.

■ In two instructions the trial court told the jury, in effect, that insanity was not a question in the guilt trial and that it must assume the defendant's sanity. Although abstractly correct, these instructions shared the vice of the intoxication instructions, confounding the jury's task of considering diminished capacity. Such ·instructions should be avoided where the defense of diminished capacity due to mental disorder is presented to the jury. If they are given, it is incumbent upon the trial judge to preserve the integrity of the diminished capacity defense by a careful explanation of the relationship between the two concepts.[3] There is a virtue in salvaging such shreds of simplicity as may be available.

Defendant contends that the trial judge should have instructed the jury *sua sponte* on the relationship of the diminished capacity defense to the defense of legal insanity

---

[2]Voluntary and involuntary manslaughter call for the same sentence, a maximum of 15 years. (Pen. Code, § 193.)

[3]See *People* v. *McDowell,* 69 Cal.2d 737, 747 [73 Cal.Rptr. 1, 447 P.2d 97].

by means of an instruction modeled upon that portion of the opinion in *People* v. *Henderson*, 60 Cal.2d 482, 490-491 [35 Cal.Rptr. 77, 386 P.2d 677], quoted in *People* v. *Goedecke*, 65 Cal.2d 850, 855 [56 Cal.Rptr. 625, 423 P.2d 777, 22 A.L.R.3d 1213].[4] He urges such an instruction as a necessary feature of the bifurcated trial system. (See fn. 3.) He also argues inadequacy of the traditional concept of malice aforethought as embodied in the instructions. Again, he seeks an instruction dealing with diminished capacity caused by involuntary intoxication attributable to alcoholism, as contrasted with voluntary intoxication.[5]

Such contentions challenge this court with doctrinal demands not yet voiced by the California Supreme Court. This court is more concerned with the practical demands of this prolonged litigation. In *People* v. *Conley, supra,* the Supreme Court essayed a suggested instruction illustrating that court's concept of a rational communication to the jury. The judge retrying this case would be well advised to adopt the Supreme Court's suggestion without the doctrinal extensions now urged by defendant.

Defendant charges error in the trial court's rejection of his request for CALJIC 303-A (New).[6] That instruction was evolved in response to *People* v. *Wolff, supra,* 61 Cal.2d at pages 821-822, which—by adding the element of mature and meaningful reflection—gave greater verbal precision to the concept of mental capacity to premeditate killing. The *Wolff*

---

[4]That part of the *Henderson* opinion declares: ''It can no longer be doubted that the defense of mental illness not amounting to legal insanity is a 'significant issue' in any case in which it is raised by substantial evidence. Its purpose and effect are to ameliorate the law governing criminal responsibility prescribed by the M'Naughton rule. . . . Under that rule a defendant is not insane in the eyes of the law if at the time of the crime he knew what he was doing and that it was wrong. . . . [E]ven though a defendant be legally sane according to the M'Naughton test, if he was suffering from a mental illness that prevented his acting with malice aforethought or with premeditation and deliberation, he cannot be convicted of murder of the first degree. This policy is now firmly established in the law of California [citations] . . . .''

[5]Compare *Powell* v. *Texas*, 392 U.S. 514 [20 L.Ed.2d 1254, 88 S.Ct. 2145]; see also, comment in *People* v. *Wolff*, 61 Cal.2d 795, 814 [40 Cal. Rptr. 271, 394 P.2d 959], dealing with the somewhat analogous problem of ''irresistible impulse'' in California law.

[6]CALJIC 303-A (New) declares: ''Before you may find the defendant guilty of wilful, deliberate and premeditated murder of the first degree, you must determine that at the time the crime allegedly was committed he not only had sufficient mental capacity to form the specific intent to kill but also had sufficient mental capacity to maturely and meaningfully deliberate, premeditate and reflect upon the gravity of his contemplated act and to harbor malice aforethought.''

56

formulation is now settled California law. (See *People* v. *Nicolaus,* 65 Cal.2d 866, 877-878 [56 Cal.Rptr. 635, 423 P.2d 787]; *People* v. *Goedecke, supra,* 65 Cal.2d at pp. 855-856.) It was justified by the evidence, and the trial court erred in rejecting it. (See *People* v. *Stewart,* 267 Cal.App.2d 366, 374 [73 Cal.Rptr. 484].) For the purpose of retrial, we point out that the suggested instruction in *People* v. *Conley, supra,* makes distinct provision for this or other appropriate instructions on deliberation and premeditation.

The court did not err in giving the standard instruction on flight, since there was evidence permitting the inference that defendant left the scene of the shooting to avoid arrest. (See *People* v. *Crawford,* 259 Cal.App.2d 874, 879 [66 Cal.Rptr. 527].)

The court gave the jury CALJIC 24 (Rev.) and CALJIC 26 (Rev.), dealing with circumstantial evidence. Contrary to defendant's claim, there is no inconsistency between these two instructions. (See *People* v. *Goldstein,* 139 Cal.App.2d 146, 151-152 [293 P.2d 495].) Although it was not error to give Number 26 before Number 24, it would have been preferable to reverse the order.

There is no merit to defendant's claim that the last sentence of CALJIC 26 (Rev.) is inconsistent with the remainder of that instruction.

Defendant assails an instruction permitting the jury to consider his prior Oregon felony conviction. At his trial the court admitted the conviction over his objection that the record failed to show an intelligent waiver of counsel in Oregon. The trial court's action in overruling defendant's objections will be discussed *infra.* On retrial the court should consider the propriety of the jury instruction in the light of *People* v. *Coffey,* 67 Cal.2d 204, 218 [60 Cal.Rptr. 457, 430 P.2d 15].

### Sufficiency of the Evidence

Defendant seeks reversal with limiting directions to the trial court, on the theory that there is no substantial evidence of premeditation and mental capacity to premeditate.

Although the jury were not instructed in terms of the ''mature and meaningful reflection'' standard enunciated in *Wolff,* that standard applies as a matter of law. Hence evidentiary sufficiency must be measured by it. This is not a bizarre killing, explainable only in terms of psychotic impulses short of legal insanity. (Cf. *People* v. *Bassett,* 69 Cal.2d 122 [70 Cal.Rptr. 193, 443 P.2d 777]; *People* v. *Wolff, supra; People*

v. *Goedecke, supra; People* v. *Nicolaus, supra.*) Reasonable jurors could attribute Conley's actions, however primitive, to a simple, understandable motive—he was bereaved by the loss of his paramour and decided that if he couldn't possess her, no one else would.

On the day of the crime he indulged in a series of actions indicative of preparations to kill. He traded his car for a rifle, bought ammunition, tested the weapon's sights. His words matched his actions, for he twice told persons that he planned to kill the McCools. Although his heavy drinking in the days preceding the killing could be ascribed to other impulses, it was also consistent with an effort to generate courage for the fateful act. Four psychiatrists testified at the trial. All four testified to some degree of personality disorder and impaired judgment. One of these witnesses, Dr. Marshall Dunham, expressed the opinion that Conley had weighed the considerations for and against the killing, that he recognized and was willing to suffer the consequences of his act, that he did not act out of impulse. Other psychiatric testimony was weaker or contrary. Since appellate review stops with the ascertainment of substantial evidence to support the verdict, the inconsistent psychiatric testimony need not be described. From the circumstantial evidence supplied by Conley's acts and statements preceding the shooting and from the opinion evidence of Dr. Dunham, reasonable fact triers could find that defendant had the capacity to kill and did in fact kill, as a consequence of mature and meaningful reflection and premeditation. The first degree murder verdict was supported by substantial evidence.

### Impeachment by Prior Felony Conviction

Defendant contends that the trial court erred in overruling an objection to his impeachment by evidence of a prior felony conviction in Oregon. The objection was based upon the ground that the Oregon judgment showed a waiver of counsel and plea of guilty, but contained no entries showing that the accused had been informed of his right to counsel and had intelligently waived it.

Decisions following Conley's last trial now demonstrate that a witness may not be impeached by evidence of a conviction obtained through the denial of his constitutional right to counsel. (*People* v. *Coffey, supra,* 67 Cal.2d 204, 218.) Proceeding upon the thesis that "presuming waiver from a silent record is impermissible," *Burgett* v. *Texas,* 389 U.S. 109 [19 L.Ed.2d 319, 88 S.Ct. 258], holds that a judgment

reflecting the accused's appearance without counsel raises a presumption of unconstitutional denial of counsel. Where the *Burgett* rule applies, the prosecution must apparently go forward with proof of waiver as a constitutional foundation for evidence of the judgment. As beneficiary of the presumption, the defendant may apparently utilize the *Burgett* doctrine to remain silent, even though he was the only person in the courtroom who actually participated in the earlier proceeding. In this case the Oregon judgment was not completely silent. It recited a waiver of counsel, but not an intelligent and knowing one. Hence the present case poses the question whether the defendant may remain silent when the question is not one of waiver, but of its intelligent and knowing character.

It is often said that in order to establish a waiver of counsel, the record must indicate that the defendant was advised of his right to counsel and to remain silent or that he knew of his rights and intelligently and knowingly waived them. (*People* v. *Harris*, 67 Cal.2d 866, 869 [64 Cal.Rptr. 313, 434 P.2d 609] ; *In re Smiley*, 66 Cal.2d 606, 614-615 [58 Cal.Rptr. 579, 427 P.2d 179].) Such pronouncements reflect a set of realistic expectations when the record of oral proceedings upon arraignment and sentence is before the court. To impeach a defendant by evidence of a prior felony conviction, the prosecution need produce only a certified copy of the judgment, not a record of the antecedent courtroom activities. (Evid. Code, § 788; Witkin, Cal. Evidence (2d ed. 1966) § 1247, p. 1150.) A judgment, after all, is only a judgment, not a chronicle of the preceding courtroom events. Although not without hesitation, it may be suggested that *Burgett* does not permit the defendant to sit in silence in the face of a judgment reciting waiver of counsel; that, as a personal participant in the prior proceeding, he has the burden of going forward with evidence or an offer to prove the waiver's falsity or inadequacy; that only in the face of such evidence, must the prosecution fortify the judgment with proof of the waiver's adequacy. So to hold would rest on the assumption that *Burgett* does not jettison California case law requiring a defendant who challenges his prior conviction to supply clear allegations of nonrepresentation or nonwaiver. (*People* v. *Coffey, supra,* 67 Cal.2d at p. 215; *People* v. *Merriam,* 66 Cal.2d 390, 397 [58 Cal.Rptr. 1, 426 P.2d 161] ; see also *People* v. *Pineda,* 253 Cal.App.2d 443, 479 [62 Cal.Rptr. 144].)

If our thesis is correct, defendant Conley failed to establish

the necessary foundation for the constitutional challenge by failing to testify or offer to prove the waiver's falsity or inadequacy. ▮▮▮ For the purpose of retrial, it is enough to suggest that *Burgett* v. *Texas* beclouds admissibility of the Oregon judgment unless it is preceded by extrinsic evidence of an intelligent and knowing waiver.

### Other Claims of Error

Defendant raises an evidentiary objection to photographs of his victim's bodies, a claim made on his first appeal, rejected there and rejected here. (*People* v. *Conley, supra,* 64 Cal.2d at p. 326.)

▮▮▮ There is substance to a claim that the prosecutor indulged in improper cross-examination in asking whether Conley had ever used a switch on one of Mrs. McCool's children. Unless opened by direct examination, this line of inquiry should be avoided at the retrial. (Evid. Code, § 773.)

▮▮▮ Dr. Dunham, one of the psychiatric witnesses, had interviewed Conley after the killing, had examined numerous documents and had testified at the earlier trials. Among the papers he saw was a written statement of the accused which the court excluded as the possible product of an inadmissible extrajudicial admission. Defendant now urges that Dr. Dunham's psychiatric opinion was based ''in significant part'' on the inadmissible writing, hence should have been excluded.

There are two reasons for rejecting the contention. First is the general rule permitting an expert to express an opinion based upon information not itself in evidence. (Evid. Code, § 801, subd. (b); *People* v. *Chapman, supra,* 261 Cal.App.2d at p. 178.) Second, even if the general rule is qualified by constitutional restrictions implicit in the ''fruit of the poisonous tree'' doctrine, the document in question was only cumulative of other data before Dr. Dunham indicating Conley's preparations for the killing.

He assigns error in the rejection of his challenge to the jury panel, made on the ground that selection from voters' lists resulted in the exclusion of minorities and poor persons. He claims no minority status for himself. ▮▮▮ Although a person outside the excluded class may conceivably have standing to challenge the systematic exclusion of that class, his conviction by a nonrepresentative jury is not a ground for reversal. (*Fay* v. *New York,* 332 U.S. 261, 287 [91 L.Ed. 2043, 2059, 67 S.Ct. 1613]; *People* v. *White,* 43 Cal.2d 740, 753 [278 P.2d 9]; see 78 Harv.L.Rev. 667.) ▮▮▮ At any rate, the

challenge for racial, ethnic and economic discrimination was carefully investigated by the trial court and testimony taken from witnesses. The trial court found no systematic exclusion of racial or ethnic minorities; found that the panel, considered in relation to the county's relatively narrow socioeconomic range, included adequate representation of wage earners as well as persons on welfare. In effect, the trial court found no factual basis for the challenge. (See *People* v. *Carter,* 56 Cal.2d 549, 569 [15 Cal.Rptr. 645, 364 P.2d 477].) This court's review of the record reveals ample justification for that finding.

The defense requested that representatives of the news media be excluded from the courtroom whenever legal arguments were occurring outside the jury's presence. The trial court ruled that it could not constitutionally exclude the press, but would direct the jurors to avoid all extrajudicial information touching the case. California law vests trial courts with a narrow discretion to close limited phases of a criminal trial to the public. (*People* v. *Cash,* 52 Cal.2d 841, 846 [345 P.2d 462]; *Kirstowsky* v. *Superior Court,* 143 Cal. App.2d 745 [300 P.2d 163].) In effect, the trial court refused to exercise its discretion. While technically incorrect, the court's refusal was not prejudicial. There is no claim that extrajudicial information reached any of the jurors.

No error occurred when the trial court permitted the prosecution, during the impanelment of jurors, to comment without emphasis on the fact that the death penalty was not in issue. (See *People* v. *Borja,* 122 Cal.App. 646, 648 [10 P.2d 477].)

Other assignments of error arise from events which will not or need not characterize defendant's retrial.

Judgment reversed.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied January 6, 1969, and respondent's petition for a hearing by the Supreme Court was denied March 5, 1969.