[Crim. No. 18579. Second Dist., Div. Five. Nov. 9, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
FREDERICK CECIL RHODES, Defendant and Appellant.

## COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**STEPHENS, J.**—By information, defendant was charged in count I with grand theft of an automobile (violation of Pen. Code, § 487, subd. 3); in count II, with robbery of one dollar (violation of Pen. Code, § 211); and in count III, with murder (violation of Pen. Code, § 187). Initially, defendant pled not guilty to each of the three counts; thereafter, he withdrew his not guilty plea to count I and entered a plea of guilty to that count. His sentencing on count I was deferred until the conclusion of his trial on counts II and III. Defendant's motion for suppression of evidence under Penal Code section 1538.5 was denied. He was tried by a jury and was found guilty of both count II (robbery in the first degree) and count III (murder in the first degree). Specifically, the jury found "said murder to have been committed in the course of a robbery or attempted robbery," thus basing their verdict upon the felony-murder rule. Defendant's motion to have a new jury impanelled for the penalty phase of his trial was denied, as was his motion for a new trial. On count III, the jury fixed the penalty at life imprisonment. Defendant's renewed motion for a new trial and motion for probation were denied, and he was sentenced to state prison for the term prescribed by law on counts I and II, and to life imprisonment on count III. Defendant appeals from both the denial of his section 1538.5 motion[1] and from the judgment.

---

[1]Denial of the section 1538.5 motion is not appealable, but is reviewable on appeal from the judgment.

## The Facts[2]

On Sunday, March 16, 1969, defendant arose at approximately 9 a.m. and ate a substantial breakfast. At approximately 10 a.m., he telephoned a friend (Eddie Guerrero) and asked him to "come over." Defendant then ingested three seconal tablets. Approximately one hour later, defendant ingested two more seconal tablets. Later that morning, he had a "pleasant" conversation with Ruth Traylor, the elderly woman with whom defendant resided at 1617 Lakeshore Avenue; they spoke of the weather and of their respective plans for the day. After their conversation ended, defendant smoked a "joint." Shortly thereafter, Guerrero arrived and he and defendant then left on foot for Elysian Park. On the way to the park, Guerrero and defendant purchased a "six-pack of beer." They arrived at the park approximately 15 minutes later, where defendant subsequently drank three cans of beer, smoked another "joint," drank some "Thunderbird wine," ingested four more seconal tablets, and intruded upon a "family barbecue" in order to obtain some food. At the time that defendant joined the barbecue, Guerrero observed that defendant's behavior was "unusual." Guerrero then left defendant at the barbecue and went in search of a ride home from the park. Guerrero got a ride with his girl friend, and upon their driving from the park (which was approximately 15 minutes after Guerrero had left defendant), they encountered defendant walking. Defendant joined them in the car, and after driving around for about 15 minutes, Guerrero's girl friend stopped her car to let Guerrero and defendant out. Defendant refused to leave the car. Defendant tore a chain which was hanging from the rearview mirror of the car and threw it at Guerrero's girl friend. The chain missed her, but struck Guerrero, who was then standing outside the car. Guerrero then "dragged" defendant from the car and advised defendant that they had better go home. Guerrero and defendant then began walking in the direction of defendant's residence. While en route to defendant's residence, defendant began "looking into cars." Guerrero counseled defendant that "if he was going to steal the car [defendant should] wait till it gets dark." Defendant ignored Guerrero's advice and continued to look into parked cars. Because of this, Guerrero told defendant that he was going to leave him, whereupon defendant started "swinging wild." Guerrero and defendant then began to fight. Guerrero observed that defendant appeared not to feel Guerrero's blows because defendant "wouldn't knock out." The fight ended by Guerrero's walking away. Defendant then walked away staggering, mumbling, bleeding from both his mouth and nose, and still peering

---

[2]Some of the facts related are taken from testimony adduced on behalf of the defense.

into parked cars. Guerrero followed defendant to a point "about a block" from Lakeshore Avenue, where Guerrero saw defendant for the last time that day.

Later that same day, at approximately 7 p.m., Lupe Martinez and Juan Hernandez had occasion to be walking on Lakeshore Avenue, in the vicinity of defendant's residence. As they were walking, they observed defendant "chasing after [a] boy with a stick." The boy that defendant was chasing escaped, and upon his escape, defendant observed the couple watching him. Defendant approached the couple, with the stick in his hand. The woman observed that defendant seemed as if he were "playing," but that defendant did not seem "normal." Defendant demanded money. The couple refused, and defendant struck the man on the head with the stick, and struck him two more times before he was given a dollar. Upon surrendering the dollar, the couple turned and ran from defendant. Defendant chased the couple, but he could not catch them, so he threw the stick, striking Lupe Martinez on her leg. Juan Hernandez then stopped running and retrieved the stick. A neighbor of Lupe Martinez, John Arrendondo, who had seen defendant throw the stick, invited the couple into his house. Arrendondo called the police. Defendant remained in front of Arrendondo's house. When the police did not respond to his call, Arrendondo stepped outside his house and demanded that defendant leave. At that time, Arrendondo observed that defendant "didn't seem like he was drunk," but that defendant "was not normal." When defendant did not leave, Arrendondo "swung the stick at him" and chased defendant from the front of the house. The police were called two more times before they arrived. Just as the police were driving up, defendant ran into the backyard of his sister's house, which was located just south of the house at 1617 Lakeshore Avenue. Police Officers Barbosa and Graham arrived in response to "a radio call to 1617 Lakeshore, a 415 [disturbing the peace]." They spoke with the couple (Martinez and Hernandez), who informed them that a man named "Fred" had chased them with a stick, had demanded money from them, had struck them with the stick, had taken a dollar, and had run into the backyard of the house south of 1617 Lakeshore. They further informed the officers that they had known the man for many years, that the man's sister lived in the house into which defendant had run, that the man lived with an older lady at 1617 Lakeshore, and that the man might then be at 1617 Lakeshore because they had observed a light go off in that house.

Officer Barbosa then went to the front door of the house at 1617 Lakeshore, knocked on the door, and called out: "Fred, police officers. Come out to the door. We want to talk to you." Barbosa repeated this several

times and received no response, but he did hear footsteps from within the house. He then returned to the police car, sent Officer Graham to the rear of the house to "cover the backyard," and called for assistance. Approximately five minutes later, Officers Gomez and Renfors responded to the call. Barbosa informed Gomez and Renfors that there had been a robbery and that the suspect might be inside the house at 1617 Lakeshore. Renfors and Gomez were not told that the suspect resided at that address, or that he was a co-resident there with another person. Barbosa directed Gomez to "cover the back door" along with Officer Graham, who was already there. Renfors then accompanied Barbosa back to the front door, where defendant was once again admonished to "come on out." After Gomez had been at the rear of the house for approximately five minutes, he heard a door open, and observed defendant exiting through the door in a crouched position. When defendant had moved to approximately 3 to 4 feet out of the "building," Gomez placed defendant under arrest. Defendant was immediately handcuffed by Gomez' partner, who together with Gomez moved defendant to the front of the house and placed defendant into a police vehicle, where Barbosa observed that defendant was "uncoordinated, swaying, and antagonistic," but that his speech was "relatively clear." Thereupon, on his own initiative, Officer Gomez returned to the rear of the house "to enter the building and check all the windows and doors to see that they were locked for purposes of securing." Gomez did not knock, nor did he ring the back doorbell, but he did call out "to see if there was anyone else in there." The rear entrance of the house consisted of a screen door and a main door made of wood and panes of glass.[3] The screen door stood partially open, and the main door, though closed, was unlocked. With neither a warrant to search the premises, nor a warrant for the arrest of any person believed to be on the premises, Officer Gomez enlarged the opening of the screen door to permit his entry, then "just turned the knob [of the main door]" and when "just barely inside the house," he saw "evidence of ransacking" and "what appeared to be a shoe and a leg." Upon further investigation, he observed that the leg was part of a female corpse, later identified as the body of Ruth H. Traylor, the woman with whom defendant resided. "Her dress appeared to be pulled up to her mid-body, exposing her privates, and [there was] blood on the floor and about the body; numerous stab wounds around the pubic area." Officer Barbosa then entered the house and observed the corpse "lying in a pool of blood," the "phone off the hook," "one or two of the drawers of the dresser open," and "some miscellaneous items

---

[3]Though the evidence is not positive, apparently there was a curtain of some sort on the inside of this door which would have prevented observation into the room from the exterior.

strewn all over." Another police officer, Richard Jacques, who was later called to the scene, found a "partially open" black leather purse with papers strewn about it. He found "a black wallet under a chair, . . . to the right of the body." When the body was moved, he found a black strap "beneath the body, approximately the right shoulder, right arm area," and he observed that "the whole area was bloody." In addition, Officers Bussard and Swan, members of the Latent Prints Section of the Los Angeles Police Department, "dusted" the house for fingerprints.

Defendant was transported to the police station, where Officer Gomez observed that there appeared to be blood on defendant's neck that was "somewhat wet," blood on defendant's hands that was "somewhat drying," and blood on defendant's shoes. While defendant was at the police station, the police searched him and discovered a dollar bill; they also booked defendant's shoes, shirt, and fingernail scrapings. Because defendant had a wound on his leg with "dried, somewhat wet blood," defendant was transported to Central Receiving Hospital for treatment.

The next day, Monday, March 17, 1969, the police discovered an abandoned car which (by guilty plea to count I) defendant admitted he stole on March 13. At the time defendant stole the car, there were some "kitchen utensils in a box in the trunk," according to the owner. When the police found the car, there was a knife lying in the front seat; the entire blade portion and "parts" of the wooden handle appeared to be covered with blood and hair. Ultimately, it was determined that there was human blood on the knife, type A, the same type blood as the deceased Ruth Traylor, and that the hair on the knife was "similar in appearance and color to the pubic hairs [of] Ruth Traylor." The car's owner later identified the knife as being "similar to" one of the knives which had been in the trunk of the car when it was stolen.

At trial, it was established that Ruth Traylor had died as a result of asphyxia, due to strangulation, 35 stab wounds to various parts of her body, and multiple blunt force injuries about the head, nose, lips, and left hand; that the death occurred approximately between 3 and 4 p.m. on the afternoon of March 16, 1969; that the most characteristic wound on the body (cuts approximately ¾ of an inch in length) corresponded to the shape and size of the knife which had been discovered on the front seat of the stolen car; that defendant had type O blood, and Ruth Traylor had type A blood; that blood found on defendant's shirt and shoes was type A blood. There was conflicting evidence as to whether some of the fingerprints taken from the scene of the death belonged to defendant. There was also testimony that the type of knife found on the front seat

of the stolen car was of the "most common types of products in the steel-ware line."

Defendant makes four contentions on appeal: (1) the evidence obtained as a result of Officer Gomez' entry into defendant's residence should have been suppressed as the fruit of an illegal search; (2) the court erred prejudicially in instructing the jury as to diminished capacity; (3) the evidence was insufficient to establish that defendant had the necessary mental capacity to be guilty of murder in the first degree; and (4) the evidence was insufficient to establish that the homicide was committed in the course of a robbery or attempted robbery.

As to defendant's contention (1), at the present level of development of the laws of search and seizure it is elementary that if Officer Gomez was searching defendant's house, and if the search was unlawful, then the fruits of that unlawful search should have been excluded at defendant's trial. In the Penal Code section 1538.5 hearing, the judge denied defendant's motion to suppress the evidence discovered as a result of Officer Gomez' entry because the purpose of the entry had been to "secure the premises." In defendant's trial, the judge again refused to suppress that evidence because "all [Officer Gomez] did was step to the threshhold to look at the inside knob of the door; and lo and behold, there's a body on the floor. Now, I don't think there was any search . . . ." We agree. As early as 1928, a California appellate court stated that "nowhere in the general law or in local ordinances can we find all the duties of a police officer set forth in detail. Indeed, those duties are so varied and indefinable that we could not expect an exact and detailed outline thereof." (*Noble* v. *City of Palo Alto,* 89 Cal.App. 47, 53 [254 P. 529].) In that case, the court was discussing the propriety of having the local police take custody of bicycles that were left unattended in the city. The court went on to say that "it is well within the duty of a police officer to make inquiry, and, pending the result of that inquiry, to assure the safety and protection of . . . property, which is otherwise liable to destruction." (*Id.,* p. 53.)

Both the United States Supreme Court and the California Supreme Court have upheld the lawfulness of police action taken for the protection of private property. In *Harris* v. *United States,* 370 F.2d 477, the United States Court of Appeals (D.C. Cir.) upheld a federal district court decision which held that evidence which was discovered within a car by an officer who was rolling up the windows of the car in order to

protect the interior from rain after the car had been impounded subsequent to an arrest was not the result of a search. "[T]he officer had opened the right front door solely for a lawful purpose (to roll up the window to protect against the rain), and . . . that action brought into open view a piece of incriminating evidence. There was . . . no search at all in relation to this particular evidence, and therefore, no Fourth Amendment issue." (*Id.*, p. 479.) The United States Supreme Court then upheld the Court of Appeal's affirmance of the District Court, adding that "[t]he precise and detailed findings of the District Court, accepted by the Court of Appeals, were to the effect that the discovery of the [evidence] was not the result of a search of the car, but of a measure taken to protect the car, . . . Nothing in the Fourth Amendment requires the police to obtain a warrant in these narrow circumstances. . . . It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence." (*Harris* v. *United States*, 390 U.S. 234, 236 [19 L.Ed.2d 1067, 1069, 88 S.Ct. 992].)

Likewise, the California Supreme Court, in another automobile case, has held that "[w]e have no doubt that the police, in the course of . . . valid protective measures, may take note of any personal property in plain sight. . . ." (*Mozzetti* v. *Superior Court*, 4 Cal.3d 699, 707 [94 Cal.Rptr. 412, 484 P.2d 84], citing *Harris* v. *United States, supra*, 390 U.S. 234.) In *Mozzetti*, the court recognized that "rolling up the windows, locking the . . . doors and returning the keys to the owner" were all valid methods of securing. (*Id.*, p. 707.) "The owner himself . . . could do no more to protect his property." (*Id.*, p. 707.)

In our case, Officer Gomez knew only that he had seen a robbery suspect exit from the house at 1617 Lakeshore in a stealthy manner, obviously in an effort to escape detection and arrest. He did not know that defendant was a co-resident in the house, although this was known by the other officers involved with defendant's arrest. He did make an "inquiry" by standing at the rear door and calling out "to see if there was anyone else in there." He got no response; upon getting no response, he made no more than the absolute minimal entry necessary in order to lock the door. He was simply performing "the duty of a police officer . . . to assure the safety and protection of . . . property which is otherwise liable to destruction."[4] (*Noble* v. *City of Palo Alto, supra*.) Securing property which the police have reasonable cause to believe has been *involuntarily* left unsecured by its owner is not improper. Officer Gomez was not search-

---

[4]Cf. *People* v. *Lanthier*, 5 Cal.3d 751 [97 Cal.Rptr. 297, 488 P.2d 625].

ing defendant's house, and "[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced into evidence." (*Harris* v. *United States, supra,* 390 U.S. 234.)

In reaching this conclusion we wish to emphasize that the officer's right to secure premises is for the benefit of the person (or persons) who might stand to lose should the property be, or have been, involuntarily left unsecured; certainly, if that person voluntarily chooses to leave the property unsecured, then that person relieves the police of both the duty and the right to protect the property. Once relieved of this duty and right, absent other independent justifications to enter, any entry would be unlawful. It is such circumstances that establish that the property has been involuntarily left unsecured that warrant the police assuming, or having thrust upon them, the obligation of securing the property. The reasonable conclusion that defendant involuntarily left the house unsecured is established by the facts of his evasiveness, shown by his refusal to respond to the officer's calls during the time defendant was inside the house; the reasonable inference that defendant knew the reason why the police sought to converse with him (the robbery); defendant's secretive and furtive exit from the house, leaving the screen door ajar; and his arrest.

Defendant's second contention on appeal is that the trial court erred prejudicially in instructing the jury on the diminished capacity issue. Specifically, defendant alleges three defects in the instructions. The first defect alleged is that the trial court failed to instruct the jury that "if the specific intent required for robbery were rebutted by diminished capacity, then the specific intent required for a felony-murder in the course of the robbery would also thereby be rebutted." Defendant concedes that the "trial court instructed the jury on the felony-murder doctrine in the context of robbery." He also concedes that the jury was instructed that "intoxication produced by alcohol, drugs, or narcotics could negate the specific intent required for robbery." Notwithstanding defendant's concessions, he contends that it "was most prejudicial" to not integrate these two concepts into one instruction. We do not agree. "Whether a jury has been correctly instructed is not to be determined from a consideration of parts of an instruction or from particular instructions, but from the entire charge of the court." (*People* v. *Monteverde,* 111 Cal.App.2d 156, 168 [244 P.2d 447].) Therefore, the fact that the necessary elements of a jury charge are to be found in two instructions rather than in one instruction does not, in itself, make the charge prejudicial.

The second defect alleged is that the trial court gave inconsistent definitions of diminished capacity in its three instructions on murder, voluntary manslaughter, and involuntary manslaughter.[5] Witkin, California Criminal Procedure, section 491, states that "the absence of an essential element in one instruction may sometimes be supplied by another. . . ." (See also *People* v. *Honeycutt,* 29 Cal.2d 52, 62 [172 P.2d 698].) Defendant does not complain that any of the instructions given was incorrect. He complains only that the instructions on voluntary manslaughter and involuntary manslaughter were not as complete as was the instruction on murder. Therefore, even if the instructions on voluntary and involuntary manslaughter were incomplete, and we are not deciding that issue, such a defect would be cured by reading all instructions as a whole.[6]

The third defect alleged is that the trial court improperly used CALJIC No. 319 (Rev.) in order to instruct the jury on the issue of voluntary intoxication. Specifically, defendant objects to the first sentence[7] of that instruction. The first sentence used in CALJIC No. 319 (Rev.) is taken from the first sentence of California Penal Code section 22. This sentence has been the focus of prior judicial attention. In *People* v. *Ford,* 60 Cal.2d 772 [36 Cal.Rptr. 620, 388 P.2d 892], the California Supreme Court ruled that this sentence, when used in the context of the other language in CALJIC instructions Nos. 78 and 319, caused those instructions to have the potential "to leave the jury in a state of confusion." A single sentence, however, may or may not be confusing, depending upon the context in which the sentence lies. In *People* v. *Hunter,* 146 Cal.App.2d 64, 67 [303 P.2d 356], the court stated: " 'Error cannot be predicated upon an isolated phrase, sentence or excerpt taken from the instructions . . . since, in order to determine the correctness . . . in their relations to and with each other and in the light of the instructions as a whole and whether a jury has been correctly instructed is not to be determined from a consideration of a part of an instruction or one particular instruction, but from the entire charge of the court.' " Specifically, *People* v. *Conley,* 268 Cal.App.2d 47, 53 [73 Cal.Rptr. 673] holds: "When there is an issue of diminished capacity due to intoxication, an instruction in the language of Penal Code section

---

[5] The instruction on murder used the terms "mental illness, intoxication or any other cause"; the voluntary manslaughter instruction used the terms "mental illness, defect or intoxication"; the involuntary manslaughter instruction used the term "voluntary intoxication."

[6] In addition to the proper language in the murder instruction, the trial court, in at least two other instructions, gave a detailed definition of what was meant by "intoxication."

[7] "No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition."

22 is not necessarily error." In *People* v. *Asher,* 273 Cal.App.2d 876, 902 [78 Cal.Rptr. 885], the court held that "[a] review of the instructions . . . reveals that the trial court emphasized and reiterated that intoxication could occasion diminished capacity which would negate the existence of the requisite mental state for either robbery or murder. By no stretch of the imagination could the jury have been confused by the reading of the first sentence of [Penal Code] section 22 in connection with the other instructions. No error can be predicated upon the giving of the instruction in the language of CALJIC No. 319 (Rev.)." The jury was instructed not to single out any sentence, but to consider all the instructions as a whole (CALJIC No. 5). ■ Like *Asher,* a thorough reading of the instructions given in the case before us reveals that there is little possibility that the single introductory sentence of CALJIC No. 319 (Rev.) could have caused the jurors to have become confused to the extent that we could now say, as a matter of law, that the giving of CALJIC No. 319 (Rev.) was prejudicial error.

■ Defendant's third contention is that there was insufficient evidence to establish that defendant had the necessary mental capacity to be guilty of murder in the first degree. Since defendant was convicted of murder under the felony-murder rule, the felony here being the robbery or attempted robbery of the deceased, Ruth Traylor, then the determining question is whether defendant possessed the necessary mental capacity to be guilty of robbery, a specific intent crime. Defendant's mental capacity was a question for the triers of fact, the jury. There was testimony given by Lupe Martinez that defendant "seemed as if he were playing" and that defendant was capable of running. Witness Arrendondo testified that defendant "didn't seem like he was drunk." Officer Barbosa testified that defendant's speech was "relatively clear." Officer Barbosa testified that he received no response to his order to defendant to "come on out," notwithstanding the fact that the officer could hear footsteps from within the house, from which the jury could properly infer that the footsteps were those of defendant, that defendant was conscious, that he heard Barbosa's order, and that defendant did not obey the order because defendant believed himself culpable for killing the victim. Officer Gomez testified that defendant had exited from the house in "a crouched position . . . looking from one side to the other," from which the jury could properly infer that defendant had the presence of mind to possess a feeling of guilt. There was evidence that a knife, which may have been the weapon used in the killing, was found in the front seat of a car some distance from the house where the body was found, from which the jury could properly infer that defendant had had the presence of mind to remove the knife from the scene of the killing. ■ It is the established law of California that

the judgment of the trial court is "presumed correct, and the evidence will not be reweighed by the appellate court in the manner of a trial judge on motion for a new trial." (Witkin, Cal. Criminal Procedure (1963) § 683.) ▮ We therefore cannot say, as a matter of law, that there was insubstantial evidence to support the finding of the jury.

Defendant's final contention is that there was insufficient evidence to establish that the homicide was committed in the course of a robbery or attempted robbery. ▮ Because the murder verdict of the jury was based upon the felony-murder rule, the felony here being either the robbery or attempted robbery of Ruth Traylor, proof of the robbery is essential to the murder conviction. ▮ Again, weighing the evidence is the function of the jury. ▮ Here, there was evidence that defendant had no money of his own on the day in question. There was evidence that defendant robbed another person, Juan Hernandez, in order to obtain one dollar. There was evidence that in the room in which the body was discovered, there was found a partially opened purse, a wallet lying under a chair, a broken strap under the victim's body, drawers of a dresser were open, papers were strewn about, and the room generally "ransacked." Here, too, we cannot say, as a matter of law, that there was insubstantial evidence to support the jury's finding of fact.

The judgment is affirmed.

Kaus, P. J., and Aiso, J., concurred.