[Crim. No. 14675. In Bank. Sept. 22, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN LANTHIER, Defendant and Appellant.

## COUNSEL

James H. Wolpman for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Edward P. O'Brien and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MOSK, J.**—Defendant was charged with possession of marijuana for sale. (Health & Saf. Code, § 11530.5.) His motions to dismiss the information (Pen. Code, § 995) and to suppress the evidence on the ground of illegal search and seizure (Pen. Code, § 1538.5) were denied, and he entered a plea of guilty. The court placed him on probation for a period of three years on the condition that he serve 60 days in the county jail. Defendant appeals from the order denying the motion to suppress the evidence and from the order granting probation.[1]

---

[1] The order denying the motion to suppress the evidence is not appealable; on the appeal from the order granting probation, after judgment predicated on a plea of

The motions were submitted on the transcript of the preliminary examination. Defendant, a student at Stanford University, had been assigned a "carrel"—i.e., a desk with attached bookcase and small locker—in a study hall in a university library building. On the morning of Monday, January 13, 1969, Joseph Riley, supervisor of maintenance services and security guards at the library, received a complaint of a noxious odor emanating from somewhere in the study hall. He was informed that "it smelled as if someone had vomited in the room," and it had been necessary to prop the doors open to air out the room throughout the previous day. That remedy had not cured the situation, however, and Riley was asked to check the room "and see if there was something causing the smell coming from the lockers." To Riley, the odor resembled that of sweet apples; he was not able to determine its source by smelling the outside of the lockers, however, as it "permeated the room so strongly that you could smell any locker and think it was coming from any locker." Using his master key, he therefore began opening each of the lockers in turn, "looking for anything that would put off the smell that was complained about in the area."

When Riley opened the locker used by defendant—the last of 42 in the room—the odor grew noticeably stronger. A briefcase occupied virtually the entire inside space. Riley removed it in order to examine the rest of the locker, and then realized the odor was emanating directly from the briefcase. On the basis of that smell, Riley testified, "I thought it was bad food that was in the briefcase. . . . So I opened the briefcase to see if it was bad food and then I saw all these small packets of material there." The contents were 38 packets of marijuana, each in a transparent plastic wrapping of the size of a sandwich bag; the odor, also described in the transcript as resembling that of sour wine, apparently came from a preservative added to the marijuana.

Although he did not know what marijuana looked or smelled like, Riley "suspected it might be something like marijuana." He informed the director of the undergraduate library, Mr. Golter, that he had found the substance which had been causing the smell, and was told to bring it to the latter's office. There he opened the briefcase and showed its contents to Golter, who said, "We'll have to find out what it is." Other Stanford officials were consulted, during which time the briefcase was held in the basement because "It was giving off a very strong odor." Finally it was turned over to

---

guilty, defendant is entitled to challenge the constitutional validity of the search and seizure in question. (Pen. Code, § 1538.5, subd. (m); accord, *People* v. *West* (1970) 3 Cal.3d 595, 600-601 [91 Cal.Rptr. 385, 477 P.2d 409] [on appeal from a judgment entered on a plea of nolo contendere, the court may review the denial of a motion to suppress evidence].)

a university police officer, who contacted the Santa Clara Sheriff's Department.

Deputy Richard Saldivar responded to the call. He testified he was advised there was "a possible narcotics violation" and that "a briefcase was found in a locker at Meyers Library at Stanford University and that a strong odor was emanating from this briefcase. It was turned over . . . by the officials at the university, and they asked me to inspect it to determine if I could identify the contents." The university police officer unfastened the catch on the briefcase, opened it, and exposed its contents; Deputy Saldivar removed one of the packets, and by sight and smell recognized the material to be marijuana. Defendant was subsequently arrested when he returned to his locker to reclaim the briefcase.

Riley testified that it was part of his job to periodically check the lockers in the study room. Once a month he opened each locker to see if it contained any overdue library books; at the end of each quarter, when the carrel permits expired, he reopened the lockers and removed their entire remaining contents, storing the latter in a utility closet until claimed by the owners; and whenever he received complaints of offensive odors he promptly examined the inside of the lockers for rotten food, explaining that "Occasionally, you find someone may leave a sandwich in there for weeks." He conceded he had not previously found it necessary to open a student's briefcase, but also testified that at least once before he had had dealings with this particular defendant when he had emptied the contents of the defendant's locker at the end of a quarter.

The defense consisted primarily of testimony bearing on the size, facilities, services, and financing of Stanford University, offered in support of defendant's contention that Riley and his fellow university officers and employees were acting as governmental agents throughout the events in question.

In overruling defendant's objections to the evidence on the ground of illegal search and seizure, the magistrate at the preliminary examination made two findings: First, he found that "the initial search by Mr. Riley in this case was a reasonable search. Mr. Riley was merely seeking to locate the source of an unpleasant odor in a part of the library that was under his control and supervision. He was not looking for contraband or illicit or stolen property or any form of evidence of guilt of any crime or other offense and, under the law, such a search is not unreasonable and it did not become unreasonable even when Mr. Riley opened the briefcase from which

that odor apparently was emanating."[2] Secondly, the magistrate ruled that governmental involvement in the operations of Stanford University was not so pervasive as to render that institution subject to the limitations placed upon "state action" by the Fourteenth Amendment.

We need not reach the latter issue.[3] Even if Stanford University were a "public" rather than a "private" institution, the search here challenged would be reasonable within the meaning of the Fourth Amendment. ▇ It is true the search was conducted without a warrant, and the burden therefore rested upon the People to show justification. (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].) ▇ But that burden was sustained in the case at bar by a compelling showing of facts bringing the search within the "emergency" exception to the warrant requirement.

In *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727], the United States Supreme Court held that routine administrative searches of private property for violations of local health or safety codes must be made with a warrant; among other objections, the court dismissed the claim that the delay attendant upon obtaining a warrant would frustrate the governmental purpose behind the search (*id.* at p. 533 [18 L.Ed.2d at pp. 937-938]). But in authorizing such warrants to be based on area-wide conditions rather than on probable cause to believe that a particular dwelling contains code violations, the court recognized that "the public interest demands that all dangerous conditions be prevented or abated" (*id.* at p. 537 [18 L.Ed.2d at p. 940]). Finally, the court was careful to emphasize that "Since our holding emphasizes the controlling standard of reasonableness, nothing we say today is intended to foreclose prompt inspections, even without a warrant, that the law has traditionally upheld in

---

[2]Earlier in the hearing the court overruled defendant's motion to strike the testimony of Riley and Deputy Saldivar on the same ground, stating that "Mr. Riley I feel had a perfect right to ascertain the source of this unusual odor. . . . And, having located the locker finally and then the immediate source as the bag and having looked in there and having at least aroused his curiosity, I think the original finding of this and observing of it was perfectly proper. And . . . the fact that the odor of course remained there, just finding it didn't eliminate the problem that the library was having. So that reporting it to the superior and indicating—apparently some clue as to what he thought it might be, and from there on, I feel all of this is perfectly proper."

[3]This and other issues relating to the rights of students under the Fourth Amendment have recently been the subject of considerable scholarly analysis and comment. (See, e.g., Armstrong, *College Searches and Seizures: Privacy and Due Process Problems on Campus* (1969) 5 Crim.L.Bull. 535; Bible, *The College Dormitory Student and the Fourth Amendment—A Sham or a Safeguard* (1969) 4 U.S.F. L.Rev. 49; Knowles, *Crime Investigation in the School: Its Constitutional Dimensions* (1964) 4 J.Fam.L. 151; Note, *Legal Relationship Between the Student and the Private College or University* (1970) 7 San Diego L.Rev. 244; Note, *The Dormitory Student's Fourth Amendment Right to Privacy: Fact or Fiction?* (1968) 9 Santa Clara Law. 143.)

emergency situations. See *North American Cold Storage Co.* v. *City of Chicago,* 211 U.S. 306 (seizure of unwholesome food); *Jacobson* v. *Massachusetts,* 197 U.S. 11 (compulsory smallpox vaccination); *Compagnie Francaise* v. *Board of Health,* 186 U.S. 380 (health quarantine); *Kroplin* v. *Truax,* 119 Ohio St. 610, 165 N.E. 498 (summary destruction of tubercular cattle)." (*Id.* at p. 539 [18 L.Ed.2d at p. 941].) The court distinguished the routine administrative searches before it as presenting "no compelling urgency," and concluded that "warrants should normally be sought only after entry is refused unless there has been a citizen complaint or there is other satisfactory reason for securing immediate entry." (*Id.* at pp. 539-540 [18 L.Ed.2d at pp. 941-942].)

In the case at bar such a "compelling urgency" was clearly shown. There had indeed been a "citizen complaint" about the malodorous smell permeating the entire study hall, and the smell was no less noticeable to Riley when he arrived to investigate. It was therefore reasonable for him to undertake, in his capacity of maintenance supervisor, a "prompt inspection" of the carrel area for the purpose of discovering and abating the nuisance. And inasmuch as the students entitled to use the room had already been disturbed by this offensive odor throughout the preceding day, further delay in suppressing it would have been unjustifiable.

Once the defendant's briefcase was discovered and opened, its contents were in plain sight. In distinction to the closed brown-paper bag containing the marijuana seized in *People* v. *Marshall* (1968) 69 Cal.2d 51 [69 Cal. Rptr. 585, 442 P.2d 665], here the contraband was packaged only in transparent plastic bags. ■ An observation from a lawful vantage point of contraband in plain sight is not, of course, a "search" in the constitutional sense (*Harris* v. *United States* (1968) 390 U.S. 234, 236 [19 L. Ed.2d 1067, 1069, 88 S.Ct. 992], and cases cited), and evidence obtained by this means is admissible without offending the Fourth Amendment.

Defendant concedes that Riley had the right, acting on his own initiative and in the discharge of his duties, to open the locker and remove the offending briefcase. He contends, however, that once Riley had thus pinpointed the source of the odor he should have refrained from opening the briefcase and should instead have stored it in the utility closet where unclaimed student belongings are kept. Secondly, defendant contends that even if it was reasonable for Riley to open the briefcase at that time, he closed it after doing so and its contents were therefore no longer "in plain sight" when Deputy Saldivar arrived on the scene. For the latter proposition defendant relies on *People* v. *McGrew* (1969) 1 Cal.3d 404, 410 [82 Cal.Rptr. 473, 462 P.2d 1], and *Abt* v. *Superior Court* (1969) 1 Cal.3d 418, 421 [82 Cal.Rptr. 481, 462 P.2d 10].

We need not reconsider this aspect of the decisions in *McGrew* and *Abt.* The emergency permitting a warrantless search of defendant's locker did not end with the discovery that the noxious odor was emanating from the briefcase contained therein. To have stored the briefcase, unopened, in a utility closet would not have eliminated the odor but would merely have transferred it to another part of the library building. Having reasonably assumed control of the briefcase under the emergency doctrine, it was equally reasonable for the university officials to open it and determine the precise cause of the smell so as to permit a proper disposition of the offending object. If, as appeared likely from past experience, the cause had simply been a piece of rotting food, it could have been removed and disposed of without further ado; the trial court, indeed, emphasized this very possibility in ruling that Riley "did what any normal person would have done under those circumstances, having the same duties to perform as he had."

It is true that upon opening the briefcase Riley did not immediately recognize the contents, although he suspected it was marijuana. But it remained a reasonable course of action for the university officials to seek to identify the substance thus exposed to view. If, for example, the substance had presented an immediate health hazard, its summary destruction might well have been justified (cf. *North American Cold Storage Co.* v. *City of Chicago* (1908) *supra,* 211 U.S. 306, 315 [53 L.Ed. 195, 199, 29 S.Ct. 101]); on the other hand, if the substance had been wholly innocuous apart from its odor it would have been proper to return it to the owner, albeit with directions to store it in a different location. Such a decision could be made only with knowledge of the precise nature of the material involved.

In their effort to identify the contents of defendant's briefcase, finally, it was reasonable for the university officials to secure professional advice by enlisting the aid of campus and local police. A single consultation by such officials with a police expert on narcotics falls far short, for example, of a general police-instigated exploratory search of student housing or belongings in the hope of turning up contraband. Rather, the officials' conduct in the case at bar is analogous to that of "the landlord or bailee who innocently discovers the suspicious circumstances, and seeks expert advice as to the nature of the use to which his premises or facilities are being appropriated. The latter would be no more than an extension of the plain-sight rule, by augmenting the observations of the layman with the expertise of the police." (*People* v. *Baker* (1970) 12 Cal.App.3d 826, 838 [90 Cal.Rptr. 508].)

Viewed in this light, the question of who opened or closed defendant's

briefcase pales into insignificance.[4] What matters here is that until Deputy Saldivar was asked to examine the briefcase, its contents remained a mystery to the officials who bore the responsibility of properly disposing of it. The deputy's inspection therefore does not require justification over and above that of the continuing emergency which authorized the original warrantless search of defendant's locker.

 We conclude there was substantial evidence to support the trial court's ruling that the contraband here in issue was not the product of an illegal search and seizure.

The appeal from the order denying the motion to suppress the evidence is dismissed as nonappealable, and the order granting probation is affirmed.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

---

[4]In any event, the fact that the briefcase was closed when it was carried to the university offices or to the campus police department appears to have been merely a matter of convenience compelled by the design of the briefcase itself. We infer from certain testimony on the point that the briefcase was of the commonplace type having a hinged opening at the top and a handle on each lip of the opening. When such a briefcase is picked up in the normal manner—i.e., in one hand, grasping both handles together—the opening automatically closes.