[Crim. No. 4281. Fourth Dist., Div. One. Nov. 4, 1971.]

THE PEOPLE, Plaintiff and Respondent, v.
WALTER FRANCIS TREMAYNE, Defendant and Appellant.

## COUNSEL

Sonja E. Sandeman for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and James H. Kline, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**COUGHLIN, J.*—**Defendant was convicted of the offense of murder in the first degree; was sentenced to life imprisonment; and appeals.

His contentions on appeal all relate to alleged errors respecting the admission of evidence he claims was obtained illegally either as a product of an unlawful search and seizure, or in violation of his *Miranda* rights.

On November 15, 1969, defendant's wife was bludgeoned to death in a bedroom of their home in San Diego. Her body was placed in the trunk of her automobile which was driven to and parked in Long Beach. On December 20, 1969, the body was found.

On November 18, 1969, defendant had reported his wife as a missing person,[1] and in telephone conversations with a policewoman stated on the evening of November 14, 1969, he and his wife went to the home of Mr. and Mrs. Hix where they stayed until 2 a.m.; then went home, went to bed and slept in the same bed; and upon awakening at about 9:30 a.m., he found his wife had gone.

On December 23, 1969, the policewoman, by telephone, made an appointment with defendant to meet Long Beach and San Diego police investigators. Thereafter, on that day, Sgt. Svidal of the San Diego Police Department, in company with Sgt. Bostard and Detective Bell of the Long Beach Police Department, went to defendant's residence; were invited into the house by him; and forthwith informed defendant he was a suspect, since it was his wife who was missing. Defendant asked the police what positive identification they had the body in Long Beach was his wife. In reply he was told the description of the ring he had given the San Diego police at the time his wife disappeared matched the ring found on the body. Defendant left the room and returned with a ring which matched the ring taken from the body. At this time he was advised of his *Miranda* rights.

The police, with defendant's consent, conducted a search of the premises, including the house and adjacent garage, for evidence establishing the identity of the murderer. The evidence marshalled by them overwhelmingly establishes defendant was the killer.

In the course of the investigation at defendant's house on December 23d,

---

*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1] On November 15, 1969, defendant had gone to the police station to report his wife missing, but a formal report was not filed because, as he was advised, the time she then was away from home was too short to justify any action.

he gave a second version respecting the events of November 14th and 15th, stating he had a feeling his wife wanted to leave the Hix residence early, because she had a date with a woman; he went to bed in the spare bedroom and his wife went to bed in the master bedroom; he was somewhat intoxicated; after spending a short time in the spare bedroom, he went into the kitchen, picked up a bottle of liquor, walked out of the house to an area near a canyon in the vicinity where he stayed until he had consumed all of the liquor in the bottle; then he returned to the spare bedroom and went to bed; and when he awoke that morning between 9 and 11 a.m., his wife was gone.

At the close of the interview on December 23d, defendant told the officers he did not want to discuss the matter any further. He was arrested, and placed in jail.

On December 24th, Sgt. Svidal interviewed defendant at the jail to obtain permission for members of the police laboratory staff to return to his residence and complete their investigation. Defendant consented. The testimony relating this incident is set forth hereinafter.

During the interview on December 24th, defendant complained about his treatment in the jail, and requested permission to see a doctor about his ulcers.

On December 25th, Sgt. Svidal contacted defendant in the jail to ascertain whether a doctor had seen him; received an affirmative response; and was told defendant was feeling better. At this time defendant volunteered statements of an incriminating nature, hereinafter detailed, including a third version of the events occurring on November 14th and 15th.

Defense counsel made a pretrial motion to suppress evidence, which the court denied. The propriety of this denial is not attacked on appeal.

At the trial, upon the examination of Sgt. Svidal and at the commencement of an inquiry concerning the events occurring when the officers went to defendant's residence on the evening of December 23d, defense counsel sought and obtained permission to approach the bench where he said: "Your honor, if the court will recall, I made a motion under 1538.5 PC to suppress any evidence that was obtained at this particular entrance into the house and I based it on the fact that the defendant had not been advised of his Fourth Amendment rights pursuant to the Constitution. Now the motion was not granted, but for purposes of protecting the record and preserving that motion, I would ask that either I be permitted to voir dire the officer if he did in fact so advise the defendant or if the District Attorney

would so at this time, so I can make my motion for the record."[2] The district attorney responded with a stipulation Sgt. Svidal did not at any time advise defendant the latter had a right to refuse to consent to a search of his premises. Thereupon, defense counsel stated: "I will make my motion to suppress or object to the evidence at this time and may I make that just a continuing motion, your Honor, even at the time he was arrested they did not." Thereupon the court stated: "The motion will be denied."

■ Defendant contends the court denied his trial motion to suppress without granting him a hearing. This contention disregards the law and the facts in the premises. At trial defendant sought only to establish he had not been advised he had a right to refuse to consent to a search of his residence; obtained a stipulation effecting this purpose; and thus eliminated the need for a *voir dire* examination. Thereupon he made his "motion to suppress or object to the evidence" without specifying any grounds. The failure to do so was fatal. (*Thompson* v. *Superior Court,* 262 Cal.App.2d 98, 102 [68 Cal.Rptr. 530].) However, in light of counsel's previous statement, we assume he was objecting to the evidence upon the ground it was the product of a search obtained by consent without advising defendant of his right to refuse to consent. The order of the court denying his motion and overruling his objection was a determination the ground for the motion or objection was without merit.

Defendant had made a pretrial motion to suppress pursuant to Penal Code section 1538.5. He did not have a right to renew that motion at the trial. (*People* v. *Superior Court,* 4 Cal.3d 605, 609-611 [94 Cal.Rptr. 250, 483 P.2d 1202]; *People* v. *Harrington,* 2 Cal.3d 991, 997 [88 Cal. Rptr. 161, 471 P.2d 961]; *People* v. *O'Brien,* 71 Cal.2d 394, 402-403 [78 Cal.Rptr. 202, 79 Cal.Rptr. 313, 455 P.2d 138, 456 P.2d 969].) However, the trial court purported to act on the merits of the motion or objection in question.

On several occasions during the trial defense counsel either objected to the admission of or moved to strike evidence obtained from an examination of defendant's residence and its contents, undertaken with defendant's consent obtained without advising him of his "Fourth Amendment rights" variously referred to as the "right to remain free from a search" or the right to remain free from a search and seizure until "a warrant was obtained." In each instance the court overruled the objection or denied the motion.

---

[2]This statement by counsel, as quoted from the record, is ambiguous. Apparently he was asking "either" for permission to examine the officer on *voir dire,* or for a stipulation by the district attorney, to establish the officer had not advised defendant he might refuse to consent to a search.

Contrary to defendant's contention the action of the trial court in the premises was proper. In *People* v. *Stark*, 275 Cal.App.2d 712, 714 [80 Cal.Rptr. 307], this court said: "The rule is now established in California that warning of the right to refuse permission to search is not a requirement to obtaining a valid and effective consent to search." Numerous decisions are cited in support of this conclusion. The Supreme Court denied a hearing. We adhere to the opinion expressed in that case.

Defense counsel on appeal acknowledges the rule in California supports the determination by the trial court; directs attention to a contrary rule adopted by some federal courts;[3] and asks this court to overrule its former holding and apply the federal rule he advocates to the case at bench. We decline to do so. ■ A state court is not required to follow the decisions of lower federal courts on constitutional issues. (*Rohr Aircraft Corp.* v. *County of San Diego*, 51 Cal.2d 759, 764 [336 P.2d 521].) The California rule is the proper rule. ■ The issue at hand does not involve the waiver of a constitutional right, which may be shown only by proof the person waiving the right had knowledge of the right he waived. (Gen. see *People* v. *Dorado*, 62 Cal.2d 338, 352-353 [42 Cal.Rptr. 169, 398 P.2d 361].) To establish such a waiver it must be shown the person waiving the right either had been informed thereof at the time of the waiver or previously had acquired knowledge thereof from other sources. (*People* v. *Dorado, supra,* 62 Cal.2d 338, 352-353.) ■ Defendant argues, in substance, evidence obtained upon a search with consent of the accused is inadmissible, unless the person consenting was advised he might refuse to consent, for the same reason incriminating statements obtained upon interrogation of an accused are inadmissible, unless the person making the statements was advised he might remain silent. (Cf. *People* v. *Roberts*, 246 Cal.App.2d 715, 729 [55 Cal.Rptr. 62].) This argument is based upon the false premise the accused in each instance is waiving a constitutional right. Defendant's varied trial-court objections to the consensual search of his residence demonstrates the lack of an analogy between the aforesaid situations. To bring the case within the warning requirements prerequisite to the waiver of a constitutional right, defense trial counsel generally premised his motions and objections upon the ground there was no showing defendant had been advised of his "Fourth Amendment rights"; and defined these rights as the right to remain free from a search and seizure or the right to remain free from a search and seizure without a warrant.

■ The Fourth Amendment provides: "The right of the people to be se-

---

[3]However, see *Gorman* v. *United States*, 380 F.2d 158, holding valid a consent to search in response to a request without advising the person giving consent he had a right to refuse to consent.

cure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . .."; protects only against unreasonable searches and seizures; and does not confer a right not to be searched or not to be searched without a warrant. (*Carroll* v. *United States,* 276 U.S. 132, 147 [69 L.Ed. 543, 549, 45 S.Ct. 280, 283]; *People* v. *Webb,* 66 Cal.2d 107, 119 [56 Cal.Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708].)

The purpose of the Fourth Amendment is to secure the privacy of people against unreasonable invasion by the police. (*People* v. *Maddox,* 46 Cal. 2d 301, 306 [294 P.2d 6]; *People* v. *Cahan,* 44 Cal.2d 434, 438 [282 P.2d 905, 50 A.L.R.2d 513].)

A search is not unreasonable where it is made under a warrant issued upon probable cause; as an incident to a lawful arrest pursuant to a warrant or for probable cause (*Chimel* v. *California,* 395 U.S. 752, 763 [23 L.Ed.2d 685, 694, 89 S.Ct. 2034, 2040]; *Agnello* v. *United States,* 269 U.S. 20, 30 [70 L.Ed. 145, 148, 46 S.Ct. 4, 5]; *In re Dixon,* 41 Cal.2d 756, 761-762 [264 P.2d 513]); in response to an "emergency situation" (*People* v. *Lanthier,* 5 Cal.3d 751, 755-756 [97 Cal.Rptr. 297, 488 P.2d 625]); with consent of the person whose premises are searched (*People* v. *Gorg,* 45 Cal.2d 776, 782 [291 P.2d 469]; *People* v. *Michael,* 45 Cal.2d 751, 753 [290 P.2d 852]); or with consent of a person the officer making the search reasonably and in good faith believes is authorized to give consent. (*People* v. *Smith,* 63 Cal.2d 779, 799 [48 Cal.Rptr. 382, 409 P.2d 222]; *Bielicki* v. *Superior Court,* 57 Cal.2d 602, 608, fn. 1 [21 Cal.Rptr. 552, 371 P.2d 288]; *People* v. *La Peluso,* 239 Cal.App.2d 715, 727 [49 Cal.Rptr. 85]—overruled on other grounds in *People* v. *Johnson,* 70 Cal. 2d 541, 554, fn. 5 [75 Cal.Rptr. 401, 450 P.2d 865].)

Consent to a search confers authority to search; establishes the reasonable nature of a search premised thereon; is not a waiver of a constitutional right; and is effective without warning the person giving the consent he might refuse to consent.

The real issue at bench is whether defendant freely and voluntarily consented to a search of his residence, and not whether he waived his constitutional right to be protected against an unreasonable search. Consent obtained by fraud or coercion, including submission to an express or implied assertion of authority, is not free and voluntary, and has no legal effect. (*People* v. *Shelton,* 60 Cal.2d 740, 746 [36 Cal.Rptr. 433, 388 P.2d 665]; *People* v. *Roberts, supra,* 246 Cal.App.2d 715, 727.) The California rule recognizes the fact a person consenting to a search was not warned he had the right to refuse to consent is a circumstance to be considered in determining whether his consent was free and voluntary. (*People* v.

*Superior Court,* 71 Cal.2d 265, 270, fn. 7 [78 Cal.Rptr. 210, 455 P.2d 146]; *People* v. *Stark, supra,* 275 Cal.App.2d 712, 715.) ■ At his trial defendant did not claim his consent to search was not free and voluntary. Instead, he attacked the validity of his consent only upon the ground he had not been advised he might refuse to consent. The issue thus raised was decided in accord with the California rule. The failure to object on any other ground, assuming the objection might have been made even though the court previously had denied defendant's pretrial motion to suppress, forecloses urging such objection on appeal. (*People* v. *Cockrell,* 63 Cal.2d 659, 667 [47 Cal.Rptr. 788, 408 P.2d 116].) ■ The rule requiring an objection in the trial court as a condition to review on appeal applies not only to evidence which is the direct product of an alleged unreasonable search, but also to evidence which is the indirect product thereof, such as incriminating statements made in the course of such a search. (*In re Dennis M.,* 70 Cal.2d 444, 462 [75 Cal.Rptr. 1, 450 P.2d 296]; *People* v. *Rinegold,* 13 Cal.App.3d 711, 716-717 [92 Cal.Rptr. 12].)

■ On appeal defendant contends, for the first time, there is no showing he consented to the search of his residence, no finding of such consent, and any consent given was not voluntary because he was in custody at the time. These contentions are without the scope of appellate review for the reason heretofore stated, i.e., the lack of any objection in the trial court. In addition, neither of them has any merit. We must assume all issues respecting the validity of the searches made by the officers were presented to and determined by the trial court in passing upon defendant's pretrial motion to suppress. The record before us does not include the proceedings on that motion. Defendant does not urge denial of the motion was error. Furthermore, there was substantial evidence at the trial defendant consented to the search in question, and a finding to this effect is implicit in the orders of the court overruling his objections and denying his motions to strike. ■ The fact an accused is under arrest at the time he consents to a search does not establish as a matter of law his consent was not given voluntarily. (*People* v. *Smith, supra,* 63 Cal.2d 779, 798; *People* v. *Cockrell, supra,* 63 Cal.2d 659, 667; *People* v. *Laursen,* 264 Cal.App.2d 932, 942 [71 Cal.Rptr. 71]; *People* v. *Roberts, supra,* 246 Cal.App.2d 715, 729.) Whether a consent was given voluntarily is a question of fact. (*People* v. *Smith, supra,* 63 Cal.2d 779, 798; *People* v. *Michael, supra,* 45 Cal.2d 751, 753.) Where, as in the case at bench, there is substantial evidence supporting the conclusion consent was given voluntarily, an implied finding to this effect, implicit in the order admitting evidence obtained pursuant to such consent, is binding on appeal. (*People* v. *Bilderbach,* 62 Cal.2d 757, 763 [44 Cal.Rptr. 313, 401 P.2d 921];

*People* v. *Roberts, supra,* 246 Cal.App.2d 715, 727; *People* v. *La Peluso, supra,* 239 Cal.App.2d 715, 728.)

When the officers went to defendant's residence on December 23d, he invited them into the house. After a short discussion respecting the identity of the body found in the wife's automobile at Long Beach, defendant was advised of his *Miranda* rights; was asked if he still wished to talk with the officers; and he replied, "Yes." During the ensuing discussion defendant was asked if he ever owned a hatchet. He replied in the affirmative and added, "It's out here in the garage." Thereupon the officers accompanied defendant to the garage where he showed them a "two handed axe"; was told they were referring to a hatchet, not an axe; then produced a hammer upon which there appeared to be coagulated blood; and when this was called to his attention, he stated, "Go ahead, take it to your lab and check it, in fact, bring your lab out here and have them check it." Evidence of the foregoing and other incidents in the garage were not the product of a search but of defendant's volunteered action. If a defendant voluntarily produces evidence against himself, no constitutional right is violated. (*People* v. *Michael, supra,* 45 Cal.2d 751, 753; *In re Dixon,* 41 Cal.2d 756, 762 [264 P.2d 513]; *People* v. *Weire,* 198 Cal.App.2d 138, 141-142 [17 Cal.Rptr. 659].) Following examination of the garage, defendant and the officers returned to the house; further interrogation ensued; defendant was asked if the officers might look at the clothing he wore on the night he and his wife were at the Hix residence and check his bedroom and bed, to which he replied, "Certainly. You can check anything you want in this house." Defendant later was asked if the officers might look in the master bedroom, and he replied, "Sure, you can look any place you like," and escorted them to the master bedroom. The officers examined the bed, bed clothing, mattress, headboard and box springs. On the under side of the mattress was "a large reddish brown stain." When defendant saw this stain, he volunteered the statement: "I can explain that," and thereafter said, "It looks like she was killed here." The covering of the box springs, in the area directly below the stained portion of the mattress was stained and damp, as though it recently had been washed. In a conversation with Sgt. Svidal defendant was asked where the sheets were that were on the bed; said he had washed them; and thereupon opened a linen closet and produced a bedsheet and two pillow cases. This is another instance where defendant voluntarily produced evidence against himself. The tenor of the evidence strongly supports the conclusion defendant avoided giving the impression he was trying to hide anything, and assumed the role of the interested husband seeking to assist the police to find the murderer of his wife in the hope this tactic would divert suspicion from him. In harmony with this concept is the following cross-examination

of Sgt. Svidal: "Q. During this entire time of interrogation that you described that occurred on the 23d of December, how would you describe Mr. Tremayne's attitude toward allowing you to converse with him and see the house, was it cooperative or not cooperative?

"A. Cooperative.

"Q. Did it appear that he was at any time trying to hide anything?

"A. No, I wouldn't—I didn't get that impression, no.

"Q. In fact, any time anything was mentioned as to you wanting to see something, he voluntarily went out and got it for you and showed it to you?

"A. I got the impression that he was trying to keep us from going into his bedroom." The answer to the last question was stricken upon motion of defendant, and the interrogation continued as follows:

"Q. When you mentioned there was a spot in the garage, did he immediately take you out to the garage to look at the spot?

"A. Yes.

"Q. When you mentioned you wanted to see the shirts he wore, did he immediately take you in to see the shirts?

"A. I believe so, yes, it was shortly after that.

"Q. And when you said, 'I want to see the bed now,' did he take you into the bedroom and say, 'You can see the bed all you want'?

"A. No, the first time I asked him to see the bed is when he brought up the bit about The Group magazine.

"Q. I see, but when you said, 'I want to see the bed,' the next time he took you right in and said, 'You can see the bed all you want.'

"A. Yes.

"Q. At any time did he refuse you permission to see anything in the house?

"A. No."

Sgt. Svidal was accompanied by Sgt. Bostard on December 24th when Sgt. Svidal sought permission for members of the laboratory staff to return to defendant's residence to complete their investigation. Respecting this incident, Sgt. Bostard testified:

"A. Sergeant Svidal asked the defendant or told the defendant that he

was interested in going back to Mr. Tremayne's residence and search for and possibly seize anything that he considered to be of evidentiary value. He started "to tell Mr. Tremayne that in the absence of Mr. Tremayne's consent he could secure a search warrant and do so and Mr. Tremayne interrupted him and said, 'No, as I said before, you can tear the house down, take anything that you want,' words to that effect."

As related by Sgt. Svidal, defendant gave permission to the officers to return to his residence to continue the investigation and stated: "Like I said before, go ahead, take the place apart, because I know the murder happened there"; and then added, "If I had been smart, I would have taken my dad's advice and not said anything from the beginning." This remark is proof defendant, throughout the investigation, knew he could remain silent and refuse to grant permission to search his residence. Pertinent in this regard is the fact the officers, on December 23d, asked defendant to take a lie detector test and he declined because "his father had advised him not to take it." Defendant did not act in submission to an express or implied assertion of authority by the officers.

 Defendant contends incriminating statements he made while in jail on December 24th and on December 25th are inadmissible because he had exercised his *Miranda* right to remain silent, which forecloses the use of those statements. The claimed exercise of defendant's *Miranda* right is premised upon his statement to the officers, on December 23d, he did not want to discuss the case further. Assuming this statement as a matter of law dictated a finding he thereafter intended to rely upon his right to remain silent, his contention, under the circumstances, is without merit for several reasons.

Defendant volunteered the statements made to Sgt. Svidal on December 24th. The officer interviewed him for the purpose of obtaining permission to enter his residence to conduct a further search. There is no evidence the incriminating statements were the product of any interrogation by the officer. Defendant moved to strike the testimony relating these statements upon the ground they were made after he had exercised his right to remain silent. The court denied the motion on the ground the statements were not the result of an interrogation but were voluntary. This ruling conformed to the governing rule in the premises. Once an accused asserts his constitutional right to remain silent the police may not thereafter interrogate him; any statements made during such an interrogation are inadmissible; but on the other hand, any statements volunteered are admissible. (*People* v. *Randall*, 1 Cal.3d 948, 955, 956, fn. 7 [83 Cal.Rptr. 658, 464 P.2d 114]; *People* v. *Ireland*, 70 Cal.2d 522, 536 [75 Cal.Rptr. 188, 450 P.2d 580];

*People* v. *Fioritto*, 68 Cal.2d 714, 718 [68 Cal.Rptr. 817, 441 P.2d 625]; *People* v. *Carroll*, 4 Cal.App.3d 52, 56-58 [84 Cal.Rptr. 60].)

 The record is not clear whether all or only a part of the statements made by defendant to Sgt. Svidal on December 25th were volunteered. The officer interviewed defendant on this occasion for the purpose of ascertaining whether a doctor had seen him as he had requested, the request having been transmitted to the proper authorities by the officer. At that time defendant acknowledged the doctor had seen him; asked if the officers had found anything on their second check of the house; was advised "the lab had impounded several things"; and volunteered the statements he had scrubbed and mopped the garage floor since his wife's disappearance and he knew a neighbor had seen him come home about 9 o'clock in the morning. Then, as testified by Sgt. Svidal, defendant asked to have a conversation "just between me and him"; was advised any conversation relating to the case would be a part of the investigation; and then stated "he still would like to discuss something with me and he continued by saying he did not go home with his wife on the Saturday morning after they had left the Hixes' residence." The officer then advised defendant they would go into the interrogation room; accompanied defendant to that room; and there again advised him of his *Miranda* rights. Thereupon, defendant related a third version of what transpired between him and his wife on the morning of her disappearance, stating he did not go home with his wife after they left the Hix residence, because she had a date and he didn't want to interfere; she dropped him off and he went to a movie; he did not arrive home until 9 a.m.; his wife was not there; her car was not in the garage; and he did not see anything unusual in the house at that time. The record does not indicate whether these statements were given in response to interrogation by the officer or were volunteered. They were exculpatory in nature; placed defendant away from the home at the time of the murder; inferred his wife was an immoral person; and were incriminating only because they were inconsistent with prior statements.

Defendant objected to the testimony relating the conversation between the officer and himself on December 25th on the ground he had not been admonished of his constitutional right to be silent. He did not object upon the ground he previously had exercised his right to remain silent. The court overruled the objection upon the ground the defendant's statements, as indicated by the testimony preceding the objection, were volunteered, and also upon the ground he previously had been advised of his constitutional rights. The latter part of the court's ruling was directed to the objection as stated, and was premised upon the fact defendant had been advised of his *Miranda* rights preceding his arrest on December 23d.

It is clear the statements made by defendant before being removed to the interrogation room were volunteered. Under the rule heretofore noted, these statements were not subject to the *Miranda* proscription, assuming defendant previously had indicated he did not wish to discuss the case any further.

Assuming the statements made in the interrogation room were the product of an interrogation, a proper objection had been made to their admission, and the order overruling the objection was error, we conclude the error was harmless beyond a reasonable doubt within the rule stated in *Chapman* v. *State of California,* 386 U.S. 18, 21-24 [17 L.Ed.2d 705, 709-711, 87 S.Ct. 824, 827-828] (gen. see *People* v. *Brown,* 4 Cal.App.3d 382, 388 [84 Cal.Rptr. 390].) The statements relating the details of defendant's third version of the events on the day of the murder are not an admission of any fact connecting him with the murder; as noted, are exculpatory; and are incriminating only to the extent they are inconsistent with prior statements. The evidence identifying defendant as the murderer was uncontradicted. He was not a witness, so the admission of an inconsistent statement was not an attack upon his credibility. Absent the third version respecting defendant's whereabouts at the time of the murder the evidence established, in accordance with his two prior versions, he was at home at that time. Undoubtedly the jury's verdict was premised upon the finding he was at home when the murder was committed; committed the murder; attempted to clean up the bloodstains on the mattress and the box springs under the mattress; and did not inform the police of these suspicious circumstances when he reported his wife was missing. In addition, there are numerous other circumstances connecting defendant with the murder which we need not enumerate.

Defendant's further contention admission of the evidence respecting his production of a ring similar to the one worn by the victim was error because he previously had not been advised of his *Miranda* rights, also is without merit. The statements and action of the defendant at the time in question were not incriminating; were not the product of interrogation; but were volunteered. No objection was made to the introduction of the evidence in question.

The judgment is affirmed.

Whelan, Acting P. J., and Ault, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 29, 1971.