[Crim. No. 35243. Second Dist., Div. Two. Mar. 11, 1981.]

THE PEOPLE, Plaintiff and Respondent, v.
RAFAEL AGUIRRE SANCHEZ, Defendant and Appellant.

## COUNSEL

Michael F. Kushner, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Pounders and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**COMPTON, J.**—Defendant Rafael Aguirre Sanchez was convicted of possession of one-half ounce or more of heroin for sale (Health & Saf. Code, § 11351; Pen. Code, § 1203.07) and of the sale of one-half ounce or more of heroin (Health & Saf. Code, § 11352; Pen. Code, § 1203.07). On appeal defendant contends that the court erred in denying his motions to quash two search warrants and to suppress the evidence found in his apartment. We affirm.

### FACTS

On October 3 or 4, 1978, Deputy Sheriff Jack Williams obtained a warrant to search George Anaya, his apartment, all storage and trash bins pertaining to his apartment, and "any vehicle under [his] control at the time [the] warrant is served" for heroin and narcotics' paraphernalia. Williams' affidavit submitted in support of the warrant, stated that on October 3 Williams had been contacted by a confidential reliable informant (a self-admitted heroin user) who told Williams that he/she had purchased "pieces" of heroin from a man named George Anaya at least 30 times during the preceding few months, that he/she. had purchased heroin from Anaya that very day, and that Anaya "always had pieces that he sold for one thousand dollars ($1,000)." The informant described Anaya, told the officer Anaya's address and phone number, and stated that Anaya "sometimes delivered but drove many different cars." The informant also pointed out the apartment where

he/she claimed Anaya lived with a woman named Gloria. The officer checked the phone number and learned that the number belonged to Gloria Bailey, who lived at the address given by the informant. Based upon the information received and his experience as a narcotics officer, Williams formed the opinion that Anaya kept and sold heroin at his apartment, delivered it in various vehicles, and would have heroin on his person, in his apartment, or in a vehicle under his control, when the warrant was served.

After he obtained the warrant to search Anaya, Williams went to Alhambra where he found Anaya, sitting on a sidewalk next to a Chevrolet which belonged to his employer, a Chevrolet dealer. At that moment Anaya was acting as the middleman in a heroin sale. Williams and his partner searched the Chevrolet and discovered three and a half ounces of heroin inside a book lying on the rear seat. After Anaya and his companions were arrested, Anaya told Williams about his own supplier, Francisco Gonzalez.

Williams used this information to obtain a warrant to search Gonzalez, his business, residence, and vehicles. Specifically, Williams' affidavit recited that the informant who had provided the information to obtain the first warrant told Williams that Anaya purchased "heroin in large quantities from a man named 'Francisco' [Gonzalez] who own[ed] the Alamos Restaurant" in Los Angeles. After his arrest Anaya told Williams that he had purchased heroin from Gonzalez about 15 times during the preceding 3 months, that Gonzalez kept most of his heroin at his residence (where Anaya had seen him retrieve a box from his bedroom closet containing "many" ounces of heroin and cocaine), but that he usually conducted business from his restaurant, where sometimes he also kept heroin. Anaya provided a description of Gonzalez as well as the addresses and phone numbers of his residence and restaurant, and stated that Anaya transported heroin in the trunks of automobiles, including a red El Camino, a white Chevrolet Impala, and vehicles he occasionally borrowed for the purpose of delivering heroin. Anaya agreed to telephone Gonzalez and order a quantity of heroin, "so [Williams] could initiate an arrest." About 5 p.m. on October 5 Anaya placed a monitored telephone call to Gonzalez asking Gonzalez if he "could pick [up] five pieces [of heroin] later [that] night." Gonzalez replied, "Sure, do they all go to the same person?" Anaya answered in the affirmative, and Gonzalez then added: "[W]hen you're ready meet me at the restaurant, [and] I'll give you a sample to give to your customer...If he likes it, we'll take him the five in a few

minutes. . . I've got it now and plenty more so come on over here to the restaurant when you're ready."

Based upon the above information Williams procured a warrant to search Gonzalez' person, residence, and restaurant, and "any vehicle under [Gonzalez'] control or occupied by [him] at the time the warrant, supported by the accompanying affidavit, is served." Williams and his partner Deputy Zabokrtski, then drove with Anaya to the Alamos Restaurant. Anaya and Gonzalez conversed briefly outside the Alamos Restaurant and then drove in a white Chevrolet to a second restaurant. Gonzalez got out, and Anaya, followed by the officers, then drove Gonzalez' vehicle to a previously arranged meeting place, where he handed the officers a sample of heroin which Gonzalez had provided. Anaya then drove back to the second restaurant to order five ounces of heroin. Gonzalez and Anaya then drove in Gonzalez' Chevrolet to 1333 Las Palmas, where Gonzalez exited the vehicle and walked alone to an apartment on the third floor. About 10 minutes later Gonzalez left the apartment with the defendant Rafael Sanchez. Gonzalez and defendant went to the rear of Gonzalez' vehicle, where defendant handed Gonzalez a white cylindrical object. Gonzalez, defendant, and Anaya then drove to a third restaurant, where Gonzalez got out of the Chevrolet and opened the trunk. The officers observed Gonzalez place the white cylindrical object inside the trunk, directly behind the rear seat. The three men then drove to a house where Anaya left his companions. About 12:15 a.m., as Gonzalez and defendant attempted to drive away from the house, the deputy sheriffs stopped the Chevrolet to execute the warrant. In the trunk behind the rear seat they discovered a plastic bag containing 128 grams of heroin wrapped in a white paper towel. Gonzalez and defendant were arrested and taken to the City of Industry police station by a third officer, Deputy Sloan.

Anaya then informed Williams that defendant had "quite a bit more heroin at his place," at 1333 Las Palmas, which he (defendant) wanted to sell. Williams decided to obtain a search warrant for the apartment and took a key to defendant's apartment from the handcuffed defendant's pocket. Williams testified he took the key to facilitate entry into the apartment in the event those inside failed to open the door when he served the warrant.

Shortly before 3 a.m., Williams and Zabokrtski drove back to 1333 Las Palmas to obtain a description of the premises for the search warrant affidavit. While Williams was standing at the apartment door,

he heard a telephone ring inside. Williams thought he heard a female voice when the telephone stopped ringing. Williams returned to his vehicle where Zabokrtski was waiting. Immediately thereafter, Deputy Sloan contacted Williams over the police radio and informed him that he (Sloan) believed he had just made a "bad mistake." Specifically, Sloan had placed Gonzalez and defendant in the booking area of the sheriff's station, where defendant had made a phone call to, Sloan believed, his residence.

According to the officers, Williams and Zabokrtski returned to the apartment, knocked, identified themselves, and called on the occupant to "please open the door." After knocking several times without response, Williams used the defendant's key to open the door. Standing outside the apartment the officers yelled: "Sheriff's Department. Is anybody here?" A light was then turned on in the dining area and a woman identified as Guadalupe Arredondo appeared. Williams showed Arredondo his badge, and said "Sheriff's Department." According to the officers the latter motioned the officers to enter the apartment. Arredondo then went into the bedroom and brought back her 13-year-old daughter Sonya to translate. Williams informed Arredondo he was there because defendant had been arrested for possession of heroin for sale and he believed there was more heroin inside the apartment. Arredondo said that defendant was her boyfriend who stayed at the apartment, but that the apartment was hers. Williams told her that she did not have to "submit" to a search of the apartment, but if she did not, he would attempt to get a search warrant. According to the officers, she replied that if there were anything in the apartment that should not be there, she wanted it "out of there," and told Williams he was welcome to search. According to the officers she led them to the bedroom and informed them that "what they were looking for" would probably be in a drawer or in the bedroom closet. Not finding anything in the drawer, the officers searched the bedroom closet. Inside a large box on the top shelf of the closet they found bags containing more than 462 grams of heroin, diluting agents, several empty plastic bags, a scale, a razor blade, and an alien registration card with defendant's picture on it.

## DISCUSSION

1. ■ *Anaya warrant.* Defendant first contends that the trial court erred in denying his motion to quash and traverse the warrant to search Anaya's residence and any vehicle driven by him because nothing in the

affidavit submitted by Williams suggested that the informant actually ever saw heroin in Anaya's residence or in any vehicle driven by him. Specifically, defendant argues that while the affidavit provided probable cause to believe that Anaya was a heroin dealer, it did not provide probable cause to believe heroin would be found in his residence or in the vehicles driven by him. We find no merit in this contention. The affidavit recites that the informant had purchased heroin valued at about $1,000 from Anaya approximately 30 times during the preceding months and as recently as that very day. The informant also accurately described Anaya, knew his phone number, and was able to direct the affiant to his residence. In addition, the informant specifically told Williams that Anaya sometimes delivered heroin and that he drove several different cars. The affidavit, when read in a common sense fashion (see *People* v. *Garnett* (1970) 6 Cal.App.3d 280, 286 [85 Cal.Rptr. 769]), provided sufficient information to enable the issuing magistrate to conclude that contraband would probably be found in Anaya's residence or in a vehicle driven by him (see *Skelton* v. *Superior Court* (1969) 1 Cal.3d 144, 149-150 [81 Cal.Rptr. 613, 460 P.2d 485]).

2. ■ *Gonzalez warrant.* Defendant next contends that the trial court erred in denying his motion to quash and traverse the Gonzalez warrant. Specifically, defendant argues that the affidavit submitted by Williams was insufficient to support the issuance of the warrant, because it was based primarily on uncorroborated information provided by Anaya, a known but untested informant. Anaya told Williams that he purchased large quantities of heroin from Gonzalez, a fact which was also told to Williams by the informant in the Anaya warrant. Anaya then told Williams that Gonzalez kept large quantities of heroin at his residence, but that he usually conducted business from his restaurant, where he also sometimes kept heroin. Anaya further said that Gonzalez usually drove one of two vehicles, but occasionally borrowed other vehicles with which to deliver contraband. Anaya also provided the phone numbers to Gonzalez' residence and restaurant. Additionally, Deputy Velasquez monitored a telephone conversation between Anaya and Gonzalez, in which Gonzalez stated that he had the heroin Anaya requested and "plenty more." The information provided by Anaya was more than adequately corroborated by the officers.

■ Defendant also argues that the authorization in the Gonzalez warrant to search "any vehicle under the control or occupied by [Gonzalez] at the time this warrant, supported by the accompanying affidavit, is served" is overbroad. The affidavit submitted by Williams

clearly provided probable cause for the issuing magistrate to believe that Gonzalez would be supplying Anaya with heroin later that evening and that he would be transporting the contraband either in one of his own vehicles, or in one he had borrowed. Accordingly, we find nothing improper about the authorization to search any vehicle under Gonzalez' control or occupied by him at the time the warrant was served.

3. ■ *The Search of Arredondo's Apartment.* Finally defendant contends that the evidence seized at Arredondo's apartment should have been suppressed. We disagree.

The trial court, after a full hearing during which the officers and Arredondo testified, found that the search was reasonable and as a result of Arredondo's voluntary consent.

■ The issue to be determined in each instance where evidence is the product of a search and seizure, is whether the officers' conduct was reasonable. (*People* v. *Tremayne* (1971) 20 Cal.App.3d 1006 [98 Cal.Rptr. 193]; *People* v. *Coffee* (1980) 107 Cal.App.3d 28 [165 Cal.Rptr. 676].) The question of reasonableness is of course to be determined on a case-by-case basis in light of all the circumstances.

■ Initially the officers here had knowledge that defendant had a substantial quantity of narcotics at the apartment. They then learned that defendant had obtained access to a telephone. When upon hearing a phone ring at the apartment and a female voice answered it, we think it was reasonable for the officers to conclude from the circumstances that defendant was calling to alert whoever was on the premises to dispose of the contraband. We further think it was not unreasonable for the officers to open the door to gain a view of the inside to see if such activity was taking place, rather than await the arrival of a search warrant and risk the loss of the evidence. This, in our view, constituted exigent circumstances.

In any event, the officers did not enter the premises. They were motioned in by Arredondo after they identified themselves. Even then the officers did not commence to search until they had advised Arredondo of her right to refuse permission. She then consented.

The trial court's finding that the consent was voluntary is supported by substantial evidence and is binding. The credibility of the witnesses

is a matter for determination by the trial court. (*People* v. *James* (1977) 19 Cal.3d 99, at p. 107 [137 Cal.Rptr. 447, 561 P.2d 1135]; *People* v. *Superior Court* (Keithley) (1975) 13 Cal.3d 406, 410 [118 Cal.Rptr. 617, 530 P.2d 585].)

A consensual search is a reasonable one and whether the consent is voluntary is a factual issue to be determined from all of the circumstances. (*Schneckloth* v. *Bustamonte* (1973) 412 U.S. 218 [36 L.Ed.2d 854, 93 S.Ct. 2038]; *People* v. *Ruster* (1976) 16 Cal.3d 690 [129 Cal.Rptr. 153, 548 P.2d 353, 80 A.L.R.3d 1269].)

We are aware of cases which hold that a consent given after an "illegal entry" cannot generally be separated from the effect of the illegal entry. (*People* v. *Henry* (1967) 65 Cal.2d 842 [56 Cal.Rptr. 485, 423 P.2d 557]; *People* v. *Johnson* (1968) 68 Cal.2d 629 [68 Cal.Rptr. 441, 440 P.2d 921].) Those cases, however, involve situations of an *actual entry coupled with a failure to advise the individual of a right to refuse permission to search.*

In contrast to those cases is the line of cases holding that a valid search may be conducted even after the officers have engaged in improper conduct so long as that antecedent conduct does not constitute any part of the basis for the subsequent search. (*People* v. *Boyles* (1955) 45 Cal.2d 652 [290 P.2d 535]; Witkin, Cal. Evidence (2d ed. 1966) Exclusion of Illegally Obtained Evidence, § 110, p. 108.)

In short, the taint of prior improper conduct can be attentuated. That attenuation can result from a subsequent voluntary consent to search. (*Restani* v. *Superior Court* (1970) 13 Cal.App.3d 189 [91 Cal.Rptr. 429].)

To reiterate, the situation here did not involve an unlawful entry by the officers. The most that can be said—assuming arguendo that it was not justified by the exigent circumstances—is that the officers improperly opened the door. That fact alone gained them nothing in regards to searching and seizing the contraband. They did not thereby gain an improper position of vantage from which they could observe the items to be seized. Once on the premises and after advising Arredondo of her right to refuse to consent, any taint which might have existed as a result of opening the door, was fully attenuated, by her voluntary consent.

The judgment is affirmed.

Beach, J., concurred.

**FLEMING, Acting P. J.,** Concurring and Dissenting.—I concur in parts 1 and 2 of the court's opinion but dissent from part 3 dealing with evidence obtained inside Arredondo's apartment during the course of a warrantless entry and search.

Under the federal and state Constitutions (U.S. Const., IV Amend.; Cal. Const., art. I, § 13) a warrantless entry and search of dwelling premises is unreasonable per se, unless it can be justified by some well-established exception to the warrant requirement. (*Vale* v. *Louisiana* (1970) 399 U.S. 30, 34 [26 L.Ed.2d 409, 413, 90 S.Ct. 1969]; *People* v. *Haven* (1963) 59 Cal.2d 713, 717 [31 Cal.Rptr. 47, 381 P.2d 927]; see also *United States* v. *Chadwick* (1977) 433 U.S. 1, 10-11 [53 L.Ed.2d 538, 547-548, 97 S.Ct. 2476]; *Chimel* v. *California* (1969) 395 U.S. 752, 763-765 [23 L.Ed.2d 685, 694-695, 89 S.Ct. 2034].) The burden of justification is especially heavy when, as here, an intrusion into dwelling premises is made by police officers in civilian clothes (T-shirts and Levis) during the dead of night (see Pen. Code, § 1533; *People* v. *Watson* (1977) 75 Cal.App.3d 592 [142 Cal.Rptr. 245]) and when those inside are not directly linked to suspected crime. At bench, the state seeks to justify the warrantless entry and search which occurred here on alternative grounds of exigent circumstances and valid consent. Neither ground, in my view, serves to validate the search.

*Exigent Circumstances.* The sole facts relied on as exigent circumstances which created an emergency and justified unauthorized entry into the apartment were the ringing of the telephone inside the apartment, the sound of a woman's voice, and the radioed information that Sanchez had made a telephone call from the sheriff's station. This court has heretofore identified exigent circumstances as including "instances where those inside are likely to be armed, or likely to attempt escape, or likely to commit further crimes of violence if entry is sought in the statutory manner. In such instances the need to neutralize specific hazards excuses compliance with the statute and justifies forcible entry without identification, demand, and statement of purpose. Exigent circumstances may also include instances which involve pending destruction of evidence. The extent to which a prospective danger of such destruction will justify an unannounced entry is not entirely clear (*People* v. *De Santiago* (1969) 71 Cal.2d 18, 29 [76 Cal.Rptr. 809, 453 P.2d 353]),

but contemporaneous attempts at destruction of evidence, or conduct which reasonably appears designed to that end, constitute circumstances which will excuse compliance with section 844." (*People v. Boone* (1969) 2 Cal.App.3d 503, 508 [82 Cal.Rptr. 566].) At bench, the only claimed emergency was the need to forestall destruction of contraband suspected to be on the premises. Yet evidence that any such destruction was taking place, or was about to take place, is wholly lacking. All we have is police surmise that defendant telephoned Arredondo, that he asked her to destroy contraband, and that she was about to comply with his wishes. Such slender and tenuous suppositions about imminent destruction of evidence do not justify nocturnal intrusion by the police into inhabited premises at 3 o'clock in the morning. As noted earlier, the sanctity of dwelling houses at night is given the highest protection of the law. (Pen. Code, §§ 460, 1533; *People v. Watson* (1977) 75 Cal.App.3d 592 [142 Cal.Rptr. 245], and cases there cited; cf. *Vale v. Louisiana* (1970) 399 U.S. 30, 34 [26 L.Ed.2d 409, 413, 90 S.Ct. 1969]; *People v. Ramey* (1976) 16 Cal.3d 263, 271-275 [127 Cal.Rptr. 629, 545 P.2d 1333].) I conclude no sufficient emergency existed to justify the unauthorized entry and search.

*Consent.* Deputy Williams testified that after knocking several times without receiving a response he opened the apartment door with the key taken from defendant's pocket, but did not cross the threshold until he had been invited to do so by Arredondo. Thereafter Arredondo, who spoke no English, communicated through her 13-year-old daughter her consent to a search of the apartment. From this testimony the state concludes that the police entered the premises lawfully and the occupants consented to the subsequent search.

I am unable to accept this gossamer fabric as proof that police entry onto the premises was authorized by those inside. To me the entry smacks of midnight visitation without regard to the wishes of the occupants. Even if we accept the police account of their entry, technically the entry remained unlawful, in that it is physically impossible to unlock an outer door with a key and push it halfway open without temporarily intruding some part of the opener's body inside. Technicalities aside, however, the security of persons in dwelling premises is effectively violated by exposure of the inside of premises to outside viewers at 3 o'clock in the morning. I find the entry unauthorized and unlawful and unjustified by any subsequent invitation of Arredondo to enter. Such being the case, Arredondo's later consent to search the premises was also ineffective, for a consent to search which is inextri-

cably bound to an illegal entry is invalid. (*People* v. *Haven* (1963) 59 Cal.2d 713, 718 [31 Cal.Rptr. 47, 381 P.2d 927]; *People* v. *Johnson* (1968) 68 Cal.2d 629, 632 [68 Cal.Rptr. 441, 440 P.2d 921]; *People* v. *Lawler* (1973) 9 Cal.3d 156, 163-164 [107 Cal.Rptr. 13, 507 P.2d 621]; *People* v. *James* (1977) 19 Cal.3d 99, 109 [137 Cal.Rptr. 447, 561 P.2d 1135].) Significantly, the trial court made no finding that either the entry or the search had been consented to.

I would suppress the evidence obtained by the warrantless entry and search of Arredondo's apartment, reverse the conviction for possession of heroin for sale, and reduce the sentence of imprisonment from six to five years.